William K. POWELL, Appellant,

v.

Martin J. WIMAN, Warden of Kilby Prison Montgomery, Alabama, et al., Appellees.

No. 18368.

United States Court of Appeals Fifth Circuit.

Feb. 24, 1961.

Rehearing Denied March 29, 1961.

R. Clifford Fulford, Birmingham, Ala., for appellant.

James W. Webb, Asst. Atty. Gen., MacDonald Gallion, Atty. Gen., State of Ala., for appellees.

Before RIVES, BROWN and WISDOM, Circuit Judges.

RIVES, Circuit Judge.

The Supreme Court vacated the judgment of this Court on former appeal,[1] and remanded this case to the district court "for a full hearing."[2] The district court at first construed the order of the Supreme Court to direct a full hearing on Powell's motion for leave to appeal from the earlier judgment of the district court, but later granted Powell's motion for a full hearing on his application for habeas corpus.

Powell is imprisoned under a ten-year sentence imposed upon his conviction in the Circuit Court of Jefferson County, Alabama, of the offense of robbery, a capital crime under the laws of Alabama.[3] Powell appealed pro se from that conviction, but no transcript of the evidence was filed and the judgment of conviction was affirmed by the Court of Appeals of Alabama in an unpublished per curiam decision.[4] The Supreme Court of the United States denied Powell's motion for leave to file a petition for writ of habeas corpus.[5] The Alabama Court of Appeals denied his petition for writ of error

1. That judgment denied leave to appeal in forma pauperis from the judgment of the district court denying Powell's application for habeas corpus.

2. Ex parte Powell, 1959, 361 U.S. 34, 80 S.Ct. 126, 41 L.Ed. 99.

3. Alabama Code of 1940, Title 14, Section 415.

4. See Ex parte Powell, 1958, 39 Ala.App. 423, 102 So.2d 923, 925.

5. Powell v. Burford, 1957, 355 U.S. 888, 78 S.Ct. 272, 2 L.Ed.2d 188.

coram nobis.[6] The Supreme Court denied certiorari.[7] Powell's application for habeas corpus was denied without a hearing by the Circuit Court of Montgomery County, Alabama, and two earlier applications were similarly denied by the federal district court. Thus, the fact accords with the implication of the Supreme Court's order, that is, Powell has sufficiently exhausted the remedies available in the State courts.[8]

Following the Supreme Court's order of remand, the district court, after a full and adequate hearing, entered a memorandum opinion finding adversely to Powell on each of his many contentions, and denied his petition for habeas corpus. From that judgment the present appeal is prosecuted. Of the many contentions presented on this appeal, it is necessary to consider only two:

I. Powell was not represented by counsel on his arraignment for the capital offense of robbery.

II. The State suppressed vital evidence upon Powell's trial.

As to the first contention, the district court found that Powell was arraigned upon the indictment and entered a plea of not guilty; that he was not then represented by counsel; that on the same day and during the same court appearance and shortly after Powell entered a formal plea of not guilty, the court appointed two attorneys to represent Powell; that, thereafter, the prosecuting attorney agreed that the arraignment be set aside if Powell's court-appointed attorneys so requested; that Powell and his attorneys decided against such action, and elected instead to conduct his trial on the plea of not guilty without pleading "not guilty by reason of insanity." After carefully reading and studying the record and exhibits, we agree with those fact findings of the district court.

While the present appeal has been pending, the Supreme Court of Alabama has ruled upon another capital case presenting much the same question of law that is posed by those facts.[9] In that case the defendant was not represented by counsel at his arraignment and for three days thereafter. Upon trial, he was convicted and sentenced to death. The Supreme Court of Alabama, upon a finding that the defendant was not prejudiced by the late appointment of counsel, denied him leave to file in the trial court an application for writ of error coram nobis. On the 9th day of January 1961, the Supreme Court of the United States granted certiorari to review that decision. Hamilton v. Alabama, 1961, 364 U.S. 931, 81 S.Ct. 388, 5 L.Ed.2d 364. We do not await the decision of the Supreme Court in that case, and refrain from expressing any view on the question of law, because the present case can and should be decided upon Powell's other contention to the effect that the State suppressed vital evidence upon his trial. Consideration of that issue requires a detailed examination of the facts, as disclosed both by the transcript of the evidence upon Powell's trial for robbery, now made available to an appellate court for the first time, and by the full hearing on Powell's petition for habeas corpus conducted by the district court.

On Sunday night, September 25, 1955, Mr. L. O. Brown closed his ice cream store in Birmingham, Alabama, at a late hour. He and his wife, with about $25.-00 in currency from the day's receipts, arrived home after 11:00 P.M. As their automobile stopped at their garage and Mrs. Brown started to get out, a man with a pistol approached the driver's side and ordered Brown to have his wife get back in the car; Mrs. Brown, of course, complied. Brown later identified that man as one James Hatt, and it is now established without dispute that the robber was James Hatt. Brown offered Hatt the money which was in a cloth sack

6. Ex parte Powell, 1958, 39 Ala.App. 423, 102 So.2d 923.

7. Powell v. People of State of Alabama, 1958, 358 U.S. 850, 79 S.Ct. 78, 3 L. Ed.2d 84.

8. See 28 U.S.C.A. § 2254.

9. Ex parte Hamilton, Ala., 1960, 122 So. 2d 602.

on the seat beside him, but Hatt at that time declined and ordered him instead to drive out of town. Hatt got in the back seat and held the pistol on Brown, directing him where to drive, first 16 or 17 miles down the Highway toward Montgomery, then turning off on a road that led from the Montgomery Highway to the Atlanta Highway, then turning off down a little-traveled dirt road for about a hundred yards, where Hatt ordered Brown to stop and turn off his lights. Hatt took the sack of money and searched the automobile for more, but without success. He then took the automobile keys, made Brown let the air out of the tires, ordered him to get back in the car and shut the door, and, according to Brown's testimony on Powell's criminal trial: "He said I am going to watch and if you open that door the light will come on, and made some statement as to how he could shoot, he had been shooting squirrels since he was a boy. And he said after a car stops in the highway and I have gotten in it and gone you can do what you want to."

The Browns stayed in their automobile for a "good while," but neither saw nor heard a car stop on the nearby highway. Finally, they got out, walked to the highway, found a telephone, and reported the robbery. The Browns did not see Powell at the scene of the crime.

The next scene is at a tourist home in Leeds, Alabama, on the night of September 30, 1955, five days after the robbery. There B. M. Dinkin, a Deputy Sheriff of Jefferson County, and John Pledger, Chief of Police of Leeds, arrested Hatt. In the room with Hatt was the appellant, William K. Powell. Under the mattress of the bed the officers found a pistol with a shoulder holster, some cartridges, a

"slapjack," a pair of rubber gloves, and a mask. Upon Powell's criminal trial, Hatt admitted that these articles belonged to him.

Powell and Hatt were taken to police headquarters in Leeds, where they were questioned jointly by Officers Pledger and Dinkin and by the Mayor of Leeds. Hatt admitted having committed the armed robbery, but Powell has made no confession either then or at any subsequent time. Upon their arrival in Birmingham, Hatt was taken to the office of the prosecuting attorney, where he gave a detailed written statement. In due course, Hatt and Powell were separately indicted for the offense of the armed robbery of L. O. Brown.

Powell was tried on January 25 and 26, 1956 on his plea of not guilty, and, as has been stated, was convicted and sentenced to ten years imprisonment. Hatt pleaded guilty on December 14, 1956 to the lesser offense of larceny from the person, and, on the recommendation of the prosecuting attorney, was sentenced to five years imprisonment.[10]

An Alabama statute provides that:

"§ 307. *Testimony of accomplices; must be corroborated to authorize conviction of felony.*—A conviction of felony cannot be had on the testimony of an accomplice, unless corroborated by other evidence tending to connect the defendant with the commission of the offense; and such corroborative evidence, if it merely shows the commission of the offense or the circumstances thereof, is not sufficient." [11]

Corroborative evidence to the testimony of Hatt "tending to connect the defendant with the commission of the

10. The inference is inescapable that Hatt received favorable consideration because of his testimony against Powell. The State prosecuting attorney testified in the habeas corpus hearing before the district court:

"Q. Now, is it your testimony that Hatt did or did not receive lighter treatment in Birmingham because of his testimony against Powell?

"A. I—I—I recommended to the court that he be imprisoned in the penitentiary for a term of five years.

"Q. And what did the court do; did he follow your recommendation?

"A. Yes."

11. Code of Alabama 1940, Title 15, § 307.

offense" consisted of testimony of Powell's association with Hatt both before and after the robbery and Mr. Brown's testimony that Powell had been employed by him for about six weeks during the Summer of 1955. Clearly, Powell could not have been convicted without Hatt's testimony. Powell's conviction or acquittal really turned upon whether Hatt was a credible witness.

In Alabama, "when a party places a witness on the stand, he thereby vouches for his credibility." [12] The State called Hatt as a witness against Powell after Hatt had pleaded not guilty by reason of insanity. Powell's court-appointed attorneys, conscientious, able and diligent, but very inexperienced—this was their first jury trial—attempted repeatedly to bring out Hatt's mental condition on cross-examination. To this, the prosecution vigorously objected.

"Q. James, have you ever received mental treatment?

"A. Yes, sir.

"Mr. Deason [the prosecutor]: Wait a minute, we object to that, immaterial, incompetent and illegal.

"Mr. Collins [Defense]: I think it is.

"The Court: Yes, I will sustain it in that form.

"Mr. Deason: Yes, sir.

"Mr. Collins: You sustain the objection, sir?

"The Court: Yes.

*    *    *    *    *    *

"Q. * * * are you also indicted for this crime?

"A. Yes.

"Q. How did you plead to that charge?

"A. Not guilty by reason of insanity.

"Mr. Collins: Your honor, I would like to inquire if they plan to go into his past psychiatric treatment.

"Mr. Deason: We object to that, this man is not on trial, just a witness.

"The Court: I sustain.

"Mr. Collins: It is not material to his credibility, is that right, sir?

"The Court: Just ask your question.

*    *    *    *    *    *

"Q. Do you feel that you are mentally capable of telling the truth in this case?

"Mr. Deason: Don't answer that. We object to that, if the Court please.

"The Court: Yes, sustain.

*    *    *    *    *    *

"Mr. Collins: James, have you had a psychiatric examination since you were arrested for this crime?

"Mr. Deason: Object, don't answer."

The State doggedly and successfully opposed every effort of the neophyte lawyers to cross examine the witness as to his insanity. And we might not criticize the State for so doing if it had not then had further information, not available to the defendant or his attorneys, which adversely reflected on Hatt's sanity. The State prosecutor had received a letter dated October 12, 1955, from a Michigan attorney and had other information to the effect that Hatt had been confined in mental institutions in three different states.[13] Hatt's mental condition was a crucial issue. Evidence of Hatt's insanity, if not sufficient to establish his incompetence as a witness, would have gone to the weight and credibility of his tes-

---

12. Equitable Life Assurance Society of U. S. v. Welch, 1940, 239 Ala. 453, 195 So. 554, 559. See also, Oates v. Glover, 1934, 288 Ala. 656, 154 So. 786, 787; Jones v. State, 1897, 115 Ala. 67, 22 So. 566; 3 Wigmore on Evidence, § 898, pp. 386, et seq.

13. That there was a real question as to Hatt's mental condition is shown by the fact that the month after Powell's conviction Hatt was sent to the Alabama Insane Hospital for an examination.

timony.[14] The successful effort of the State prosecuting attorney to keep from the jury what he knew to be substantial evidence of Hatt's insanity is not consistent with the high standard applicable to state prosecuting attorneys, as well as to United States Attorneys:

> "The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." [15]

The evidence goes further, and shows that the State prosecuting attorney permitted Hatt to testify without correction to material facts directly contrary to the written statement which the attorney had previously taken from Hatt.

Upon cross-examination by Powell's counsel, Hatt testified:

> "Q. (By Mr. Collins:) Now, James, I believe you said you came to Leeds, Alabama, with the defendant, you weren't exactly certain when, Friday, Saturday or Sunday, is that right? A. I can't say when.
>
> "Q. But, you remember going to Leeds, Alabama, with the defendant? A. Yes.
>
> "Q. But, you don't know whether it was Sunday or two days before then or two days after that? A. Well, it was before Sunday.
>
> "Q. It was before Sunday? A. Yes.
>
> "Q. Probably Saturday? A. Saturday or Friday or somewhere.
>
> "Q. Where did you go then, where did you stay, you probably located yourself some place? A. In the rooming house.
>
> "Q. You went to the rooming house? A. Yes.
>
> "Q. Friday or Saturday with the defendant Powell? A. Yes.
>
> "Q. And you didn't know what time, you didn't know whether it was day or night? A. No, I don't remember what it was.
>
> "Q. And then you and the defendant, you stated, went out and drove by Mr. Brown's house, is that correct? A. Yes, the Sunday before the robbery I believe it was.
>
> "Q. After you had been in town a couple of (sic) three days? A. Yes."

The State did not disclose that it had strong reason to believe that testimony to be untrue. Yet the State then had in its possession a written statement from Hatt that on the Friday and Saturday before he robbed L. O. Brown on Sunday he had committed two other armed robberies, the one on Friday in Tampa, Florida,[16] and the other on Saturday in Mont-

---

14. Redwine v. State, 1952, 258 Ala. 196, 61 So.2d 724, 727; Garrett v. State, 1958, 268 Ala. 299, 1958, 105 So.2d 541, 547; Hutcherson v. State, Ala.App.1958, 108 So.2d 177, 178.

15. Berger v. United States, 1935, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314.

16. Hatt's statement described the Tampa robbery as follows:
"Q. Did you pull any robberies in Tampa before you left? A. Yes.
"Q. Where? A. We got $6 off a taxi-cab driver.
"Q. Where was that? A. In Tampa. I am pretty sure it was in Tampa.
"Q. Do you know what part of the city that was? A. No, I don't even know that city.
"Q. Do you remember when that was with reference to the present time, how many days ago? A. Week ago last Friday. Today is Friday, isn't it?

gomery, Alabama.[17] According to Hatt's statement, he met Powell for the first time in Tampa just before the Tampa robbery, and Powell was an accomplice in the Tampa robbery and in the Montgomery robbery. Hatt's statement as to Powell's participation in those robberies was, of course, hearsay as against Powell, and would not in any event have been admissible against Powell on his prosecution for the robbery of L. O. Brown. However, when Hatt testified that he had been with Powell at Leeds, Alabama, on Friday or Saturday, or for two or three days before the robbery of L. O. Brown on Sunday the State had good reason to believe that that testimony was false, and it could not allow it to go uncorrected.

Further, the State knew that Hatt's admissions contrary to his testimony were admissions of two armed robberies which the jury could well have believed to have a bearing on Hatt's credibility. Indeed, Hatt's admissions in the statement as to his activities earlier in the week preceding his robbery of L. O. Brown reflected on his credibility to the n'th degree. According to his statement in the possession of the State prosecuting attorney, Hatt admitted the possession of three pistols which he had stolen from a gun store in West Palm Beach, Florida, "a week ago last Tuesday." He further admitted that on Wednesday he had held up a bartender and a woman customer in West Palm Beach and got $33.00 from them. Hatt stated that no one was with him on either of those occasions. According to Hatt's statement, he had forced the bartender whom he had robbed to drive him in the bartender's car about

"Q. Yes. A. Week ago today.

"Q. You got $6 from him? A. Yes.

"Q. How did you get the money? A. Well, Bill, he took me—he told me to go to such and such a corner where he knew —he knew that town, and I didn't, and he said he would be there waiting for me, so, I got a cab and told him to take me to that corner, and I was pretty tight right then. I couldn't hardly walk straight. I called the bartender, and had the bartender call, and the cab came, and I got there, and he was there only just a minute, and once I pulled the gun on him—

"Q. Where was Bill when you pulled the gun on him? A. He was parked right behind us about 15 yards, I guess, parked in a car.

"Q. After you pulled this gun on the taxi-cab driver and got the money from him, where did you go? A. We headed —Bill went and picked up his clothes and headed out of town. We headed out of town."

17. Hatt's statement described the Montgomery robbery as follows:

"Q. Where was that? A. Montgomery, I believe.

"Q. What did you get there? A. $12.

"Q. Who did you rob there? A. Cab driver.

"Q. When was that? A. Saturday night, I believe it was.

"Q. That was the night before you came into Birmingham? A. Yes, sir.

"Q. Where was he when you got the money? A. Well, we—he said, 'get a cab.'

"Q. Who said that? A. Bill Powell.

"Q. All right. A. He said—I used his suitcase, mostly to make it look like I was traveling on a bus and was a veteran going to the Veterans Hospital, and he drove out there and picked out a place back off the road a little ways, and I took him—I told him to take me to the Veterans Hospital, and when he turned around the corner to take me to the hospital, I told him to drive straight around into a little grove like. There was trees around, kind of like a city dump.

"Q. Close to the Veterans Hospital? A. Yes, back of it.

"Q. That was last Saturday night? A. Yes.

"Q. Then, when you got out there and stopped, what did you do? A. I told him to strip his clothes off so I could have time to walk away.

"Q. Did he undress? A. He took all but his shoes.

"Q. What did you do with his clothes? A. Buried them across the city on the other side of town.

"Q. Do you know about where you buried them? A. I don't know whether it is—there is a state prison you go by, and I don't know whether it was on this side or that side.

"Q. Who was with you when you buried the clothes? A. Bill Powell. He covered them up."

75 miles on the highway toward Tampa where he "let him out on the highway to hitch hike back, and I took the car on a ways further and dropped it off." At Tampa, according to the statement, Hatt met Powell, whom he said he had never seen before.

To summarize, Hatt's statement, in the possession of the State's attorney, admitted that during the week preceding the robbery of L. O. Brown, Hatt had committed a burglary, an armed robbery, a kidnapping, and the theft of an automobile before meeting Powell, and had committed two other armed robberies with the claimed assistance of Powell.

While the State was willing to vouch for Hatt's credibility, it is extremely doubtful whether the jury would have agreed if it had been furnished this evidence which remained in the exclusive possession of the State. Not only did the State fail to disclose that Hatt's statement contradicted Hatt in a most material part of his testimony, and reflected on, if it did not indeed destroy, his credibility, but it affirmatively represented to the jury that Hatt had told in the statement the same story that he told on the witness stand.

"Q. (By Mr. Deason:) Now, he has asked you if you talked to anybody in the solicitor's office. I will ask you if on the 30th day of September, 1955, if you didn't make a complete statement about your activity in this robbery down at the solicitor's office, is that correct? A. Yes.

"Q. You remember me down there? A. No.

"Q. Asking you certain questions and a man writing them down? A. I can't say for sure.

"Q. Well, you remember making a statement down at the solicitor's office, is that correct? A. I remember telling my story.

"Q. In other words, you remember telling your story the same day you were arrested, that is correct, isn't it? A. I can't say for sure whether it was the same day or not.

"Q. Immediately after, shortly after. A. Yes, sir.

"Q. And did you tell the same story then that you are telling on the witness stand? A. Yes."

Thus the State actually bolstered Hatt's testimony by reference to this statement, while keeping the contents of the statement to itself.

Hatt's full written statement was first disclosed over the objection of the State in response to a subpoena duces tecum issued by the district court in the present hearing. As we have heretofore stated, it does not appear that the Alabama Court of Appeals has had an opportunity to examine the transcript of evidence in Powell's criminal trial. We make these remarks in justice to that Honorable Court. In the course of its opinion on Powell's application for leave to file a writ of error coram nobis, the Alabama Court of Appeals said: "We are as zealous as anyone that our penitentiaries should confine no one who is innocent." [18] We know that that is true. Nothing said in this opinion is meant to reflect upon the Court of Appeals of Alabama. That Court has had before it practically none of the evidence now before this Court.

■ It nonetheless remains true that, as reluctant as a federal court is to interfere with or upset the judgment of a state court, we cannot allow the present judgment of conviction to stand. Whether or not any one of the instances which we have recited in which the State failed to disclose or suppressed evidence going to Hatt's credibility would suffice by itself, the totality of all of them, under the circumstances of this case, leaves no doubt that Powell's trial was attended by such fundamental unfairness as to amount to a denial of due process of law.

18. Ex parte Powell, 1958, 39 Ala.App. 423, 102 So.2d 923, 927. Incidentally, we are not passing on the guilt or innocence of Powell, but simply on whether his trial met the standards of due process.

"* * * it is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment * * *. The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears * * *.

"The principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness. The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend * * *."[19]

 Powell has now been imprisoned for more than five years. With good time and other allowances, his sentence will probably expire within less than another year. The Court's duty upon a habeas corpus hearing is to "dispose of the matter as law and justice require." 28 U.S.C.A. § 2243; cf. 28 U.S.C.A. § 2106. From the present record, without more, it would appear that Powell's discharge will best serve the ends of justice. Aderhold v. O'Neill, 5 Cir., 1933, 66 F.2d 85; Reid v. Sanford, D.C.N.D. Ga.1941, 42 F.Supp. 300, 303, 304; 39 C.J.S. Habeas Corpus § 102, p. 690, note 92.

This opinion has, however, gone beyond the findings of the district court, and even beyond the briefs of counsel, in elaborating upon the State's suppression of, and failure to disclose, vital evidence upon Powell's trial. Further, it is still not entirely clear whether the State disclosed any evidence to Powell's counsel before he was tried and convicted, which is, of course not shown by the transcript of evidence in his trial. Under such circumstances, we accord the State an opportunity to request a further hearing in the district court, and to make such showing of additional evidence from which the district court may determine whether such further hearing is warranted. The district court will, of course, require that the State act promptly. If the district court grants any further hearing, then, so far as is consistent with the rights of the State and of Powell to introduce all relevant evidence, the district court will expedite such hearing and the entry of a final judgment. The judgment of the district court is reversed and the cause remanded for further proceedings consistent with this opinion.

Reversed and remanded.

19. Napue v. People of State of Illinois, 1959, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 32 L.Ed. 1217.