STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v. HENRY A. VIGLIANO, DEFENDANT-APPELLANT.

Argued June 5, 1967—Decided July 7, 1967.

*Mr. Leonard I. Garth* argued the cause for defendant-appellant (*Messrs. Stephen A. Ploscowe* and *Richard K. Rosenberg* on the brief).

*Mr. Archibald Kreiger,* Assistant County Prosecutor, argued the cause for plaintiff-respondent (*Mr. John G. Thevos,* Passaic County Prosecutor, attorney).

The opinion of the court was delivered by

FRANCIS, J. On January 6, 1963, sometime around midnight, Catherine (Mrs. Dario) Vigliano was shot fatally in her home in Paterson, New Jersey. Her son, defendant Henry A. Vigliano, aged 23 years, was charged with shooting her and was indicted for first degree murder. After trial ending in May 1963, in which the State sought the death penalty, he was convicted by a jury of first degree murder with a recommendation of life imprisonment. On direct appeal to this Court under *R. R.* 1 :2–1(c), we reversed upon a determination that the trial court had committed plain error in its instructions to the jury concerning the defense of insanity. *State v. Vigliano,* 43 *N. J.* 44 (1964).

Vigliano was retried between March 15 and April 16, 1965. Over defendant's objection the State renewed the demand for the death penalty. The jury again found him guilty of first degree murder and recommended life imprisonment. Another appeal followed.

On the second appeal a number of trial errors were alleged as a basis for reversal of the conviction. After argument of the entire matter we dealt with one alleged error on an intermediate basis because we felt the record was inadequate to permit a proper disposition of it, 47 *N. J.* 504.

Dario Vigliano, husband of the victim and father of the defendant, testified against him at both trials. The State conceded that his testimony provided important inculpatory proof supportive of its case, and corroboratory of significant parts of the son's confession.

Defendant lived with his mother and father in Paterson. He was engaged to be married at the time of the shooting. His father, Dario, operated a tavern in Paterson. On Sunday, January 6, 1963, Henry left the house around 4:00 P. M. to visit his fiancee, who also resided in Paterson. He remained with her until about 11:00 P. M. and then drove to his father's tavern. After his arrival there he and his father had a disagreement about the father's intoxication. A scuffle ensued and (according to defendant's statement to the police

after the shooting of Mrs. Vigliano) defendant left the tavern and went home, arriving there about 11:30 or 11:45 P. M.

In his written statement to the police, Henry said that his mother began to upbraid him, cursing him and calling him vile names. He went upstairs to his bedroom, removed a revolver from his desk and put it in a shoulder holster in his closet. His mother came into the room and continued to "rave and rant" at him. Not being able to "take it" any longer he "reached in for the service revolver only to scare her." He said he thought it was unloaded. (He did not mention this in his oral statement which was given first.) He "pointed it at her and fired twice." She slumped down and he picked her up and put her in a chair. Then, still according to his statement, he returned to his father's tavern, remained there until closing time (about 1:00 or 1:15 A. M.). He and his father drove home together and he went up to his room where his mother was unconscious in the chair. He called the police and asked for a squad car because there had been an accident. He telephoned his fiancee also and talked to her mother, saying his mother had been shot twice and that apparently she had attempted suicide.

Defendant did not testify at either trial in his defense. His testimony on each occasion was introduced during the hearing to determine the voluntariness of his oral and written inculpatory statements to the police. During this appearance on the witness stand, however, in answer to his attorney's question he denied shooting his mother and said he knew nothing about the crime.

It is apparent from the short factual recital above that Dario Vigliano's testimony was important because it showed (thereby supporting defendant's inculpatory statement) that defendant had left the tavern sometime between 11:00 and 11:30 P. M., returned later and then remained until the closing hour, 1:00 or 1:15 A. M. Further, as the record shows, his testimony also indicated circumstantially that when Dario and defendant arrived home, defendant seemed intent on diverting his father from saying good-night to his mother.

The second trial began with the selection of the jury on March 15, 1965. On March 27, while the trial was in progress, Dario Vigliano was committed by the Municipal Court of Paterson to Hope Dell Hospital's psychiatric ward for observation and possible treatment. Defense counsel knew of the commitment on the day it occurred but did not make further inquiry as to his condition before April 5 and 6, when he was produced by the State as a witness. After Dario had testified about his son's activities at the tavern on the night of the shooting, as well as his departure, later return and his driving Dario home after the closing of the tavern, defense counsel sought to cross-examine about Dario's commitment for psychiatric study. The State's objection was sustained in spite of the defense argument made out of the presence of the jury that the subject of the witness' mental condition was a proper one to pursue on the issue of Dario's credibility. The inquiry having been thus abruptly terminated in that fashion, defendant made the propriety of the ruling a ground of appeal. When the appeal was argued in this Court we considered the record inadequate and remanded in the light of *State v. Butler*, 27 *N. J.* 560, 605 (1958), so that an exploration could be made as to what a full cross-examination on the matter of Dario's mental capacity would have revealed, what the State knew of his condition when he was produced as a witness, and what available medical and hospital evidence would reveal as to that mental condition. We directed also that, after the additional evidence had been compiled, the trial court should entertain an application for a new trial based thereon. The *per curiam* opinion of remandment noted that if a new trial was denied, we desired the additional record to be returned to us, and we would consider it along with the pending appeal. *State v. Vigliano*, 47 *N. J.* 504 (1966).

## I

The hearing on the remand produced some startling facts. When Dario Vigliano was admitted to Hope Dell on March

27 he was confused, uncooperative and unmanageable. On March 29, on examination by two physicians, he was found to be confused and disoriented and suffering from senility, chronic brain syndrome associated with cerebral arteriosclerosis. Both doctors recommended commitment to the State Hospital for the Insane at Greystone Park, N. J. The Hope Dell record, which clearly notes the above facts, shows also that at 1:10 P. M. on March 29 county prosecutor's detective Edmond requested that Dario be kept at Hope Dell until further notice from him.

In the late afternoon of March 29, Edmond and the assistant prosecutor who was trying the State's case against defendant visited the hospital and talked with Dario. The next day the trial continued but neither the assistant prosecutor nor Edmond informed the court or defense counsel of the notes appearing on the hospital records as to Dario's mental state, or that the two doctors had recommended commitment to Greystone Park and had signed affidavits on the same day certifying that Dario was insane and required confinement.

As has been noted, on April 5 and 6 prosecutor's detectives brought Dario to court to testify and returned him to Hope Dell after each appearance. This was done with the knowledge and consent of the assistant prosecutor. This was the state of affairs when the assistant prosecutor objected to defense counsel's cross-examining Dario about his commitment to Hope Dell for psychiatric examination on March 27.

On April 6, after Dario was returned to the hospital by the detectives, he was transferred to Greystone Park and admitted there. Both the assistant prosecutor and Edmond knew on April 7 of the admission to Greystone Park. The trial continued for eight court days thereafter, but neither the assistant prosecutor nor Edmond notified the court or the defense about the commitment.

Relying on the additional evidence adduced on the remand, defendant sought a new trial. The trial judge agreed on the motion that under *State v. Butler, supra,* it

was erroneous not to have permitted the cross-examination at the trial as to the Hope Dell commitment. He felt, however, that Dario's value as a State's witness had been wholly destroyed by defendant's other cross-examination, and by the police officers' testimony that he was intoxicated on the night of the shooting when they arrived on the scene. Consequently, in his judgment, the error was not prejudicial and even if the proof of Dario's insanity had been introduced the result "probably would be the same." We cannot accept that view. Our reading of Dario's testimony in light of the entire record satisfies us that its overall substance was amply sufficient to require leaving evaluation of its weight and credibility to the jury. In this connection, it should be noted also that defendant not only denied the killing but claimed that if he did shoot his mother, he was insane within the *M'Naghten* rule when he did so. See *State v. Lucas,* 30 *N. J.* 37 (1959). In view of the evidence in the case as to the previous psychiatric history of the mother and of the defendant, we agree with the defense contention that the evidence as to the father's mental condition was an additional factor open for consideration by the jury on the insanity issue.

The State and the trial court have expressed the view that the evidence submitted on the post-trial hearing was available to the defense attorney when Dario was first on the witness stand, and could have been produced if due diligence had been exercised. There is no doubt that most of the material was open to examination and subpoena by defendant; nor is there any doubt that counsel knew Dario had been sent to Hope Dell for observation. Counsel explained why he did not pursue the matter. The complaint in the municipal court against Dario was made following a visit to the Vigliano home by him in company with prosecutor's detective Edmond. The visit was made during the trial pursuant to a court order permitting an inspection of the room where the shooting occurred. Dario resented what he thought was an unwarranted intrusion and a disturbance resulted which

produced the local court proceeding. Defense counsel felt that Dario's excitement was a temporary matter which would pass over after a night at Hope Dell. His omission to pursue the matter further either before or after Dario testified may not have represented the best course of action or the course that others might have followed. But neither perfection nor omniscience is a constant attribute of mortals, and if the cross-examination of defendant's father had been allowed it seems likely that the entire situation would have been exposed. *Cf. State v. Pickles,* 46 *N. J.* 542, 569 (1966) ; *Goldstein v. Pennsylvania Greyhound Lines, Inc.,* 23 *N. J. Super.* 126, 131 *(App. Div.* 1952).

Whatever may have been the shortcoming of the defense in not adequately investigating Dario's hospitalization, the grave delinquency of the State cannot be overlooked. *Barbee v. Warden, Maryland Penitentiary,* 331 *F. 2d* 842 (4 *Cir.* 1964). The primary duty of the State in criminal prosecutions is not to seek convictions; it is to see that justice is done and truth is revealed. *State v. Tate,* 47 *N. J.* 352, 356 (1966) ; *Giles v. State of Maryland,* 386 *U. S.* 66, 87 *S. Ct.* 793, 17 *L. Ed. 2d* 737, 758 (1967) ; concurring opinion. Suppression of evidence favorable or helpful to a defendant's cause, even where the evidence concerns only the credibility of a state's witness against defendant, denies him a fair trial and violates due process. *Brady v. State of Maryland,* 373 *U. S.* 83, 83 *S. Ct.* 1194, 10 *L. Ed. 2d* 215 (1963) ; *Napue v. People of State of Illinois,* 360 *U. S.* 264, 79 *S. Ct.* 1173, 3 *L. Ed. 2d* 1217 (1959) ; *Alcorta v. Texas,* 355 *U. S.* 28, 78 *S. Ct.* 103, 2 *L. Ed. 2d* 9 (1957) ; *State v. Taylor,* 49 *N. J.* 440 (1967) ; *Barbee v. Warden, supra; Ashley v. State of Texas,* 319 *F. 2d* 80 (5 *Cir.* 1963) ; *Powell v. Wiman,* 287 *F. 2d* 275 (5 *Cir.* 1961) ; *Griffin v. United States,* 87 *U. S. App. D. C.* 172, 183 *F. 2d* 990, 993 *(D. C. Cir.* 1950) ; Note, *The Prosecutor's Constitutional Duty to Reveal Evidence to the Defendant,* 74 *Yale L. J.* 136 (1964). When prejudicial suppression occurs, a new trial must be ordered whether the prosecution's conduct is willful, *United*

*States ex rel. Almeida v. Baldi,* 195 *F.* 2*d* 815, 33 *A. L. R.* 2*d* 1407 (3 *Cir.* 1952), *certiorari* denied 345 *U. S.* 904, 73 *S. Ct.* 639, 97 *L. Ed.* 1341 (1953), or merely negligent, *United States v. Consolidated Laundries Corporation,* 291 *F.* 2*d* 563 (2 *Cir.* 1961); and see, *State v. Taylor, supra.*

The purpose of this salutary rule is not to punish society for a prosecutor's conduct, but to avoid an unfair trial of an accused. Our system for the administration of criminal justice could not tolerate the erosion that would follow in the wake of such trials. Society's interest is served as much by acquittal of an innocent person as by conviction of a guilty one. Thus whenever it appears that the prosecution has suppressed or withheld material evidence favorable to the accused, his conviction must be declared void. See also, *United States ex rel. Meers v. Wilkins,* 326 *F.* 2*d* 135 (2 *Cir.* 1964); *Application of Kapatos,* 208 *F. Supp.* 883 (*S. D. N. Y.* 1962); Note, *The Duty of the Prosecutor to Disclose Exculpatory Evidence,* 60 *Colum. L. Rev.* 858 (1960). And the availability of the non-disclosed evidence to defense investigation ordinarily cannot be regarded as determinative. *United States ex rel. Meers v. Wilkins, supra,* 326 *F.* 2*d,* at *p.* 140. The conduct of the State in this instance, in not revealing its knowledge of the diagnosis of Dario's insanity, thrust into the trial an element of unfairness sufficiently substantial to require reversal of the conviction, and a remand for a new trial.

## II

The remand for retrial brings into focus once more the issue of admissibility of Vigliano's oral and written inculpatory statements. The significant difference between the two statements is that in the oral one defendant did not say he thought the gun was unloaded when he pointed it at his mother and fired twice. In the written one given at police headquarters he made the less incriminating assertion of a belief that it was unloaded. At the first trial, the court and the jury, each acting independently of the other, as is re-

quired by our practice, found both statements were given voluntarily. On our review, in which we considered the effect of *Escobedo v. State of Illinois,* 378 *U. S.* 478, 84 *S. Ct.* 1758, 12 *L. Ed.* 2d 977 (1964), even though Vigliano was tried and convicted before that decision, we reached the same conclusion. 43 *N. J.,* p. 49.

On the second trial a different trial judge and jury, each considering the issue independently on substantially the same evidence, again found the statements were voluntary. Moreover, the trial court found no violation of the *Escobedo* rule. The attack on those findings is renewed on this appeal. As a consequence we have reexamined the record and we find on the totality of circumstances surrounding the making of the oral and written statements that there was ample justification for the conclusion of judge and jury that the State had borne the affirmative burden of establishing voluntariness. With respect to the forthcoming third trial, defendant contends that a new and more rigid test must be applied in deciding the issue of admissibility of the oral statement and the one written statement allowed in evidence at the second trial. (The second written statement was made after Mrs. Vigliano's death and after defendant's preliminary hearing on the homicide complaint in the municipal court. The trial court declined to admit that one and we consider it out of the case.) We are referred to *Miranda v. State of Arizona,* 384 *U. S.* 436, 86 *S. Ct.* 1602, 16 *L. Ed.* 2d 694 (1966), decided on June 13, 1966, which it is said requires the exclusion of defendant's confessions at the forthcoming trial.

In that case the United States Supreme Court laid down the following as the test to be applied in passing upon the admissibility of a confession:

"To summarize, we hold that when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized. *Procedural safeguards must*

be employed to protect the privilege and unless other fully effective means are adopted to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored, the following measures are required. He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation. After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him." 384 U. S., at pp. 478–479, 86 S. Ct., at p. 1630.

At the outset of our consideration of the effect to be given Miranda, it must be noted that the Supreme Court declared the new constitutional doctrine established thereby "should apply only to cases commenced after" the decision was announced, i. e. June 13, 1966. See, Johnson v. State of New Jersey, 384 U. S. 719, 733–734, 86 S. Ct. 1772, 16 L. Ed. 2d 882 (1966). At another point, the Johnson opinion says the Miranda guidelines are "available only to persons whose trials had not begun as of June 13, 1966." 384 U. S., at p. 734, 86 S. Ct., at p. 1781. The words requiring application of Miranda to "cases commenced" after June 13, 1966, and the language making it "available only to persons whose trials had not begun" as of that date have created some uncertainty as to whether the new rule must be made available to a person already tried and convicted long before Miranda but whose conviction is reversed on appeal a year after Miranda, and the cause is remanded for a new trial. Is such a case "commenced" after June 13, 1966 within the contemplation of Johnson? The tenor of Miranda, and particularly of Johnson, leads us to the conclusion that the rule was intended to apply only to cases which are tried for the first time after June 13, 1966. This seems fair to the State and to the defendant because in the investigation of the alleged crime, in the interrogation of the defendant, and in the trial

of the case, the accepted constitutional standard by which the conduct of the police in obtaining a confession from defendants was to be judged was different from the more rigid standard imposed prospectively by *Miranda*.

In post-*Miranda* cases, if it appears that the prescribed mandatory warnings were not given by the police or that the accused was not advised of his right to the presence of an attorney during police questioning, the rule being absolute, evidence obtained thereafter through interrogation is not admissible. But in pre-*Miranda* cases a less stringent standard of police conduct had been accepted constitutionally for many years, and the police had relied upon that standard in good faith. Simply stated, the test of admissibility of inculpatory admissions was whether, in the light of the totality of the circumstances existing at the time, the statements were freely and voluntarily given by the accused, without any promise of reward, or any duress or coercion, mental or physical; and in determining voluntariness, the failure, if any, of the police to warn him of his right to be silent or of his right to counsel was a factor to be considered. See *Davis v. State of North Carolina,* 384 *U. S.* 737, 86 *S. Ct.* 1761, 16 *L. Ed. 2d* 895 (1966).

In *Johnson v. State of New Jersey, supra,* the Supreme Court indicated that retroactive application of *Miranda* was not a matter of constitutional compulsion; and that there were "no jurisprudential or constitutional obstacles" to a directive that the "new judicial standards" be applied "in a wholly prospective manner." 384 *U. S.,* at *p.* 733, 86 *S. Ct.* 1772. And utterance was given to the Court's recognition of the states' long-time reliance upon the preexisting, more general rule. Chief Justice Warren said:

"* * * We have pointed out above that past decisions treated the failure to warn accused persons of their rights, or the failure to grant them access to outside assistance, as factors tending to prove the involuntariness of the resulting confessions. * * * Prior to *Escobedo* and *Miranda,* however, we had expressly declined to condemn an entire process of in-custody interrogation because of such conduct by the police. * * * Law enforcement agencies fairly relied

on these prior cases, now no longer binding, in obtaining incriminating statements during the intervening years preceding *Escobedo* and *Miranda*. This is in favorable comparison to the situation before *Mapp v. Ohio*, 367 *U. S.* 643, 81 *S. Ct.* 1684, 6 *L. Ed. 2d* 1081 [84 *A. L. R. 2d* 933] (1961) where the states at least knew that they were constitutionally forbidden from engaging in unreasonable searches and seizures under *Wolf v. People of State of Colorado*, 338 *U. S.* 25, 69 *S. Ct.* 1359, 93 *L. Ed.* 1782 (1949)." 384 *U. S.*, at *p.* 731, 86 *S. Ct.*, at 1780.

\*       \*       \*       \*       \*       \*       \*       \*

"All of the reasons set forth above for making *Escobedo* and *Miranda* nonretroactive suggest that these decisions should apply only to trials begun after the decisions were announced. *Future* defendants will benefit fully from our new standards governing in-custody interrogation, *while past defendants may still avail themselves of the voluntariness test.* Law enforcement officers and trial courts *will have fair notice* that statements taken in violation of these standards may not be used against an accused. Prospective application only to trials begun after the standards were announced is particularly appropriate here. *Authorities attempting to protect the privilege have not been apprised heretofore of the specific safeguards which are now obligatory.* Consequently they have adopted devices which, although below the constitutional minimum, were not intentional evasions of the requirements of the privilege." 384 *U. S.*, at *p.* 732, 733, 86 *S. Ct.*, at *p.* 1780. (Emphasis added.)

\*       \*       \*       \*       \*       \*       \*       \*

"In the light of these additional considerations, we conclude that *Escobedo* and *Miranda* should apply only to cases commenced after those decisions were announced." 384 *U. S.*, at *p.* 733, 86 *S. Ct.*, at *p.* 1781.

The quoted language indicates to us that the Court felt the admissibility of pre-*Miranda* confessions should be judged by standards or guidelines theretofore constitutionally acceptable. It has been suggested that if this is so, the appropriate time for application of the new rule should be the date of the taking of the confession. But there is no constitutional imperative which regulates or fixes the cutoff date for application of a formerly valid rule, or the date from which the new or replacement rule must operate. As the Court said in *Johnson*, "the retroactivity or nonretroactivity of a rule is not automatically determined by the provision of the Constitution on which the dictate is based." 384 *U. S.*, at *p.* 728, 86 *S. Ct.*, at *p.* 1778. Obviously, there

is a large measure of judicial discretion involved in deciding both the issues of prospective or retrospective application and the time from which the new principle is to be deemed controlling. In selecting the beginning point for the *Miranda* rule the Court could have taken the date of the confession, but in the exercise of its discretion and for reasons of policy a decision was reached to make it applicable to cases commenced after June 13, 1966, the date of the *Miranda* opinion. In doing so, the emphasis was placed on the reliance by police authorities on the validity of the previously existing tests for admission of confessions, and the fact that "past defendants may still avail themselves of the voluntariness test." This factor of reliance appears to have been of critical influence in the aspect of decision-making relating to prospective or retrospective application of new doctrines in the criminal law field. See *Linkletter v. Walker,* 381 *U. S.* 618, 85 *S. Ct.* 1731, 14 *L. Ed. 2d* 601 (1965) ; *Tehan v. U. S. ex rel. Shott,* 382 *U. S.* 406, 86 *S. Ct.* 459, 15 *L. Ed. 2d* 453 (1966) ; *Johnson v. State of New Jersey, supra; Stovall v. Denno,* 87 *S. Ct.* 1967 (June 12, 1967).

From all of the above, we hold the view that the Court's references to cases commenced and trials begun after June 13, 1966, and to its policy in other cases of application of similar new rules "in a wholly prospective manner," signify an intention that the *Miranda* rule should apply only to cases tried for the first time after June 13, 1966. In context we take "commenced" and "begun" to have the same significance, *i. e.,* to refer to those cases or trials which were initiated or in which the first step was taken after the stated date. This view accords with a commonplace of the criminal law in this country, *i. e.,* an order for a new trial as an incident of a reversal of a conviction on appeal simply amounts to a continuance of the same case looking toward a final judgment of either acquittal or conviction. *Cf. State v. Lamoreaux,* 20 *N. J. Super.* 65 (*App. Div.* 1952).

If reliance by the authorities on the previous law is sufficient reason not to apply *Miranda* to cases tried and still on

direct appeal on June 13, 1966 (see, *Johnson v. State of New Jersey, supra,* 384 *U. S.,* at *p.* 753, 86 *S. Ct.* 1926), it would seem that such reliance should have the same operative effect if the appeal results in a reversal and an order for a new trial. We find this thought also in the recent case of *Stovall v. Denno, supra,* which held that the new rule of *United States v. Wade,* 87 *S. Ct.* 1926 (1967) and *Gilbert v. State of California,* 87 *S. Ct.* 1951 (1967) making identification of an accused in a police lineup in certain situations inadmissible at trial, when the lineup was conducted without notice and in the absence of counsel, was to be applied only when the lineup was held after the common date of the three decisions. And in that connection the Court said:

"We also conclude that, for these purposes, no distinction is justified between convictions now final, as in the instant case, and convictions at various stages of trial and direct review. We regard the factors of reliance and burden on the administration of justice as entitled to such overriding significance as to make that distinction unsupportable." 87 *S. Ct.,* at 1972.

Our conclusion as to the inapplicability of the *Miranda* rule to a retrial of cases like the one before us has had some consideration in courts of other jurisdictions. Disparate results have been reached. The Supreme Court of Delaware and the County Court of New York have taken the view we now espouse. *Jenkins v. State, Del.,* 230 *A. 2d* 262 (1967), *aff'd on reargument; People v. LaBelle,* 53 *Misc. 2d* 111, 277 *N. Y. S. 2d* 847 *(Cty. Ct.* 1967). Contrary cases are: *Gibson v. United States,* 363 *F. 2d* 146 (5 *Cir.* 1966), which contains no discussion of the problem; *State v. Ruiz, Hawaii,* 421 *P. 2d* 305 (1966), a footnote holding that *Miranda* shall apply on retrial of the defendant; *State v. Brock,* 101 *Ariz.* 168, 416 *P. 2d* 601 (1966), a one sentence note that *Miranda* shall apply on retrial; Justice Udall dissented, citing *Johnson v. State of New Jersey, supra,* and saying "It is neither logical nor reasonable that the retrial of this cause should be conducted under different rules than prevailed when it was

tried the first time."; *State v. Shoffner,* 31 *Wis.* 2d 412, 143 *N. W.* 2d 458 (1966), again simply a reference to the fact that *Miranda* had been decided on June 13, 1966, and a statement that "Since this case is to be retried, the admissibility of any statements offered by the state should be determined by the trial court under the principles of *Miranda*", and therefore on the facts appearing in the record the defendant's "statement will be inadmissible upon a new trial"; one justice dissented on the basis of *Johnson v. State of New Jersey, supra.*

We realize that the differing viewpoints as to the precise area of nonretroactivity of *Miranda* is not a matter we can resolve with certainty or finality. But for this jurisdiction, resolve it we must according to our best judgment. To that end, as we have already indicated, the tenor of *Johnson v. State of New Jersey* and *Stovall v. Denno,* and particularly the emphasis in those cases on the justified reliance by police authorities on the previously sanctioned guidelines for police conduct, have drawn us to the conclusion that the voluntariness test should be utilized here on the retrial in determining the admissibility of Vigliano's oral and written confessions. It seems to us that this comports with the statements in the *Johnson* opinion that *Miranda* "should not be applied retroactively," 384 *U. S.,* at p. 732, 86 *S. Ct.* 1772, that *Miranda* "should apply only to cases commenced after" the decision was announced, 384 *U. S.,* at p. 733, 86 *S. Ct.,* at p. 1780, and that "[f]uture defendants will benefit fully from our new standards governing in-custody interrogation, while past defendants may still avail themselves of the voluntariness test." 384 *U. S.,* at p. 732, 86 *S. Ct.,* at p. 1780. See *People v. Worley, Ill.,* 227 *N. E.* 2d 746 (*Sup. Ct.,* decided June 22, 1967).[1]

---

[1] *"People v. Worley* came to our attention after receipt of the July 4, 1967 issue of United States Law Week, after our opinion herein had been filed. Because of the pertinence of *Worley,* we have added the above reference to it."

## III

In addition to contending that *Miranda* should be followed on retrial, in the event of a reversal, defendant argues that the new rule should be utilized on this appeal in testing the propriety of the admission of Vigliano's statements at the previous trial. Substantially for the reasons expressed above, and because the United States Supreme Court found no "persuasive reason" to extend *Miranda* to cases already tried and on appeal on June 13, 1966, we feel that fairness to the State requires us to apply the voluntariness test in this case as we have in others involving the same question. See, *State v. Rudd*, 49 *N. J.* 310 (1967) ; *State v. Boynes*, 49 *N. J.* 303 (1967) ; *State v. Lowery*, 49 *N. J.* 476 (1967).

## IV

At the first trial of this indictment the State sought the death penalty. The jury found defendant guilty of murder in the first degree but recommended life imprisonment. At the outset of the second trial after our reversal of the conviction and remand, the State, over defendant's objection, again sought the death penalty. As noted above, defendant was convicted of the same degree of murder, but the jury again recommended life imprisonment. It is argued on this appeal that the trial court erred in permitting the death penalty to be an issue because that aspect of the case had been disposed of finally by the verdict at the first trial.

While the appeal was pending, this Court concluded in *State v. Wolf*, 46 *N. J.* 301 (1966), that when a defendant is put to trial for first degree murder in which the death penalty is sought, and the jury, although finding him guilty of first degree murder, rejects the death penalty and recommends life imprisonment, the defendant's life cannot be put in jeopardy again on a retrial following reversal of the conviction. Further discussion of the issue is not necessary. The death penalty is barred from the forthcoming retrial.

## V

In the main charge to the jury, the trial court gave instructions covering voluntary and involuntary manslaughter. Presumably the definition of involuntary manslaughter was considered relevant because of evidence in the case of oral statements by Vigliano to the police that he thought his gun was not loaded when he pulled the trigger. Under the circumstances the court followed the judicious course in submitting the issue of involuntary, as well as voluntary, manslaughter to the jury. (It may be noted that on the first appeal we dealt only with the problem of voluntary manslaughter as it was raised on the evidence submitted at that trial. *State v. Vigliano,* 43 *N. J.,* at *p.* 60.)

After some hours of deliberation, the jury requested the court to again explain manslaughter and second degree murder. In response, voluntary manslaughter and second degree murder were redefined, but in spite of defendant's request the court refused to cover the subject of involuntary manslaughter. That failure is now raised as a ground for reversal. The State says that even if it was error, the error was harmless because the jury found guilt of first degree murder.

Since the case is to be retried we need say only that defendant's request should have been granted, particularly since the court had already charged on the nature of involuntary manslaughter. In the retrial we suggest that the subject be dealt with again.

## VI

Defendant challenges the admissibility of certain testimony of a witness called by the State as an expert. The witness qualified primarily as a chemist and toxicologist. In addition he said he had been associated with the State Police since 1939. In the latter connection he had visited the scene of many crimes and had assisted in the investigation by interpreting conditions found there and reporting on them.

During the trial, in company with a prosecutor's detective, the witness visited the room where Mrs. Vigliano was shot. This was two years and two months after the shooting. While there he observed the bullet holes in the walls, looked at splatter marks on the walls, and at police photographs of the room taken shortly after the shooting, examined the autopsy report, and formed an opinion as to the direction of the first bullet fired at Mrs. Vigliano. After this preliminary proof, the prosecutor put a hypothetical question to the witness incorporating a number of physical facts and certain of the witness' conclusions. The question concluded:

"Now, assuming all these factors and all these facts that I have indicated to you, do you have an opinion as to the probability of what had happened at the scene in relation of the victim to the defendant; can you give us such an opinion?"

The defense objected that the question was not the proper subject of expert opinion; it called for speculation and conjecture; and it called for the giving of ultimate factual conclusions, which were the function of the jury to determine. Further efforts were made then to qualify the witness by showing that on at least 100 occasions he had gone to a scene where a homicide or a suicide with a gun was involved, and had assisted the police in deciding what had happened. The trial court then allowed him "to testify as an expert in interpreting certain aspects of the scene of a crime."

Thereafter, in answer to a series of questions the witness gave an opinion as to the position of Mrs. Vigliano before and after each shot, and whether she was sitting or standing; the direction she was facing when shot; the position of the defendant and whether he was standing or sitting; whether he moved from one position to another between the shots; the path of the bullets; the position of the chair in which Mrs. Vigliano was sitting (if she was sitting when shot) with relation to the east wall of the room; which was the first bullet that struck her; and the degree of deflection of the course of a bullet which he felt had come about when

the bullet struck a bone in her head. On cross-examination the witness was asked if the interpretation he had put on "the events and the characteristics that exist within that room" are "completely positive." He answered in the negative. Then, when asked if they were "probable," he said, "No, I can't say they are probable." After his testimony had been completed, defendant moved unsuccessfully to strike it from the record.

In our judgment it was error to permit the witness to give to the jury his interpretation of the facts and his opinion as to the conclusions to be drawn from particular facts recited. Although the scope of permissible expert testimony is constantly and properly expanding with the development of scientific knowledge, the questions propounded here were of such character and so ambiguous in context as to call for speculation rather than permissible expert opinion. *State v. Sachs,* 69 *N. J. Super.* 566 (*App. Div.* 1961); *Crawford v. State,* 262 *Ala.* 191, 78 *So. 2d* 291 (1954); *People v. Creasy,* 236 *N. Y.* 205, 140 *N. E.* 563 (1923); *People v. Overacker,* 15 *Cal. App.* 620, 115 *P.* 756 (*Dist. Ct. of App.* 1911); *People v. Milner,* 122 *Cal.* 171, 54 *P.* 833 (1898); and see, *Houston v. Traphagen,* 47 *N. J. L.* 23 (*Sup. Ct.* 1885). His answers, in effect, told the jury his theory of how the homicide was committed; and obviously he was speaking in terms of possibility and conjecture. Moreover, we find nothing in his qualifications to warrant the conclusion that he is competent or qualified to express opinions on the particular subjects involved. We have had occasion previously to criticize this kind of invasion of the jury province, and the State should not risk reversal by utilizing it. See, *State v. Pickles,* 46 *N. J.* 542, 578 (1966).

## VII

We have examined the other grounds for reversal urged by defendant, and have found no prejudicial error in them.

## VIII

For the reasons expressed, the judgment of conviction is reversed, and the cause is remanded for retrial.

*For reversal and remandment*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For affirmance*—None.