[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 49 
This is a petition for writ of certiorari filed by Clarence Womack to review the decision of the Court of Criminal Appeals. That court affirmed a circuit court's denial of Womack's petition for writ of error coram nobis.
On June 5, 1981, Womack was indicted for the capital murder of Arthur Bullock. On March 24, 1982, Womack was found guilty of murdering Bullock in the course of a robbery and the jury recommended the death sentence the following day. On April 30, 1982, the trial court sentenced Womack to death. The Court of Criminal Appeals affirmed the conviction and death sentence.Womack v. State, 435 So.2d 754 (Ala.Cr.App. 1983). This Court also affirmed his conviction and sentence. 435 So.2d 766 (Ala. 1983).
On July 9, 1984, Womack filed a petition for writ of error coram nobis in the Montgomery County Circuit Court. The circuit court held an evidentiary hearing on November 19 and 20, 1984, and reconvened on January 7, 1985. On February 5, 1986, the court denied the petition, without opinion or findings of fact. On April 14, 1987, the Court of Criminal Appeals affirmed the denial of the petition. 541 So.2d 40 (Ala.Cr.App. 1987). This Court granted certiorari to review two issues: First, whether the State denied Womack due process of law guaranteed under the Fourteenth Amendment by its failure to produce exculpatory information within its control; second, whether Womack was denied his Sixth Amendment right to counsel by virtue of defense counsel's numerous allegedly prejudicial acts and omissions during the guilt phase of trial.
 I.
The facts of this case are complex, but a thorough understanding of them is necessary *Page 50 
for a just disposition of the issues presented. Because the opinion below and the earlier opinions on direct appeal adequately explain the operative facts of the crime, we will elaborate on them only as necessary to address the issues presented.
On February 2, 1981, the City Curb Market, located in Montgomery, Alabama, was robbed by someone who killed the owner, Mr. Arthur Bullock, by shooting him with a pistol. Although there were no eye-witnesses to the crime, the State called as witnesses several customers who were in the store just before and just after the crime. Dora Helms testified that she purchased groceries from Bullock on the morning of February 2, 1981. She returned home with her purchase and was met by Mattie Hunt, a friend of the family. Shortly thereafter Mrs. Hunt went to the City Curb Market for beer. She testified that Womack was in the market buying cigarettes when she purchased the beer. Mrs. Hunt returned to Mrs. Helms's house and sometime later sent her eight-year-old daughter, Demetrius, to the market for cigarettes. Demetrius went to the City Curb Market but returned when she could not find Mr. Bullock.
James Reffin, who is a route salesman for Flowers Baking Company, testified that he was making a delivery that morning in the same block as the City Curb Market. A man came to him while he was making the delivery and told him that he had found Bullock on the floor. The two men returned to the City Curb Market and found Bullock shot and apparently dead. The men then went up the street and called the police, who arrived on the scene at approximately 11:55 a.m.
We first discuss the facts regarding the withholding of exculpatory evidence by the State, beginning with evidence gathered at the initial stage of the investigation and continuing through the trial. The first aspect of this alleged violation involves suppression of exculpatory police reports.
On February 5, 1981, Montgomery Police Officer G.J. Vaillancourt drafted a supplementary police report on the Bullock murder. The report contained information gathered from Rex Jones and Neal Martin, who were in jail for first degree robbery and were suspects in the Bullock murder as well. The report indicated that Jones and Martin had spoken to two police officers regarding Womack's involvement in the murder. They indicated that on February 2, the date of the Bullock murder, Clarence Womack and another subject known as "Red" were at Jones's house, located at 407 Flood Street, talking about having murdered Bullock. Jones related to the police that Womack told him that the reason the robbery went sour was that a little girl was coming toward the store and they ran off. Jones stated that Womack had said he was the one who shot Bullock during the robbery. Jones and Martin were shown "mug books" and, according to the report, identified Ralph Miller as the man known as "Red." The statement by Jones and Martin is inconsistent with their later statements to the police and with their testimony in court. They indicated in court that they met Womack and Charles Johnson on Early Street and discussed the crime there, not at Jones's house on Flood Street as stated in the police report. The inconsistency between the police report of February 5, on the one hand, and later police reports and Jones's testimony before the jury, on the other hand, is sufficient to cast a doubt on Jones's veracity. The February 5 report, therefore, tended to exculpate Womack. Maurice Bell, Womack's defense attorney, testified at the coram nobis hearing that he was not provided with this information prior to trial.
On February 10, 1981, Montgomery Police Officer R.H. Roper drafted a supplementary police report regarding the Bullock murder. The report indicated that Mrs. Denise (Dora) Helms, who was later called by the State as a witness to the events surrounding the offense, had been shown two line-ups that included Clarence Womack and that she did not identify him as the person she saw leaving the City Curb Market on February 2. This information tended to exculpate Womack, because Mrs. Helms was called on behalf of the State. Attorney Bell also testified at the *Page 51 
coram nobis hearing that he was not provided this information prior to trial.
On February 19, 1981, Montgomery City Police Officer D.H. Carmichael drafted a supplementary police report regarding the Bullock murder. The report contained statements by Rex Jones that contradicted his statement of February 5. The report on the 19th indicated that a meeting occurred between Womack, "Red," Jones, and Martin on Early Street, rather than at Jones's house, as indicated earlier. Jones also indicated that Womack did not get any money because Bullock would not open the safe, rather than because he was scared off by the little girl, as Jones had indicated on the 5th.
The report also indicated that Womack was in custody on Friday, February 6. Officer Carmichael indicated that Womack was in custody at 3:15 p.m., at which time he began questioning him in regard to the Bullock homicide. The report states the following:
 "Womack was under the influence of some form of intoxicant. He was really not fit to talk to. This continued until about 4:30 p.m. At this time, Sgt. Norton said to talk with him about 30 more minutes and then to turn him over to second shift. Investigator Horenkamp and myself did this and at the end of that time, turned Womack over to the second shift."
This report tended to exculpate Womack both because it showed inconsistencies with prior statements by the State's key witnesses and because it showed Womack's intoxication when the police interrogation began. Maurice Bell indicated at the coram nobis hearing that he was not provided with this information at the trial or at the suppression hearing.
Womack allegedly confessed to the Bullock murder at 10:30 p.m., Saturday, February 7, 1981. The Montgomery Police Department did not make an audio or video tape of this alleged confession. Officer R.T. Ward typed the statement that Womack signed. Officer Ward was alone with Womack in the interrogation room when he took the statement, but there were several police officers present when Womack signed it. The statement, which was admitted at the trial, states the following:
 "Monday me and Nanny-Goat was walking over on Jeff Davis Avenue and Nanny said, let's get the man's money. And we was right at the City Curb, so I knew what store he was talking about. We went into the store and walked around until this woman that was in there left. I asked the man at the counter for some cigarettes and matches. The man gave me a pack of Kool cigarettes and some matches. I paid him, and that's when Nanny pulled the pistol and told the man that this was a stickup. The man turned around and started reaching under the counter, and Nanny shot him. I ran out the door and went home. I don't know where Nanny went."
The statement was followed by a narrative between Ward and Womack wherein the following was elicited:
"Question: Tell me all you can about Nanny-Goat.
 "Answer: His real name is Charles something. He's about twenty-nine, five foot ten, hundred and forty pounds, light skin, afro. He stays in Smiley Court with his mama. He also goes to a dude's house named Kid in Smiley Court. I don't know his real name. If you go to get him, go to Kid's house. Kid lives on North Smiley by that store. I will take you there. I ain't doing all this time by myself.
". . .
 "Question: Why did you decide to go on and tell the truth about the robbery and murder?
 "Answer: Because you made a lot of sense about what you told me. I wanted to tell you, that's all."
The defense offered by Womack at the suppression hearing and trial was that the typed statement was not dictated by Womack but rather was composed by Ward and represented a conglomeration of the evidence gathered prior to Womack's arrest and that Womack's signature thereon was coerced. *Page 52 
Perhaps Womack's most serious allegation of the State's failure to produce exculpatory information involved suppression of a plea bargain with Neal Martin, who was a key witness before the grand jury, and suppression of exculpatory evidence offered by him. Robert Beno, who defended Martin in the three robbery charges pending against him at the time of Womack's case, testified at the coram nobis hearing in regard to the exculpatory evidence that Martin revealed to him. Beno testified at the coram nobis hearing that, sometime after Martin gave his grand jury testimony, Martin sent him a letter indicating that Womack was innocent and that the grand jury testimony was false.
Beno went to visit Martin at the city jail sometime in June of 1981, largely in response to Martin's letter. Beno said that Martin explained to him, at that time, that the authorities had offered him a sentence of 10 years on his three robbery charges in exchange for his grand jury testimony and cooperation with the authorities. During that interview in jail, Martin explained that Rex Jones had committed the murder, while Martin was the "look out man" for the crime. Beno, who had prior approval from the Alabama State Bar to testify against his client at the coram nobis hearing, explained that Martin was adamant about Womack's innocence throughout the interview.
Beno's testimony is corroborated by the letter that Martin sent to him while Martin was in prison. The letter, which is undated but which was authenticated by Martin at the coram nobis hearing, was not only exculpatory of Womack, but strongly implicated both Martin and Jones. The letter explained that, before anyone was even implicated in the Bullock murder, the police offered Martin 10 years on his robbery cases if he could give them someone to convict. Martin explained in the letter that Jones came into his cell on that day and proposed to "burn" Womack on the murder, and that shortly after Jones made that proposal officers Carmichael and Ward took them out of the cell and explained the story to them. According to what Martin said in the letter, "They even wrote it down what I was suppose [sic] to say if I didn't I would receive 99 years." (Emphasis in original.) The letter went on to say that Martin was scared for helping the police "put away" an innocent man and that, in essence, his grand jury testimony was perjured.
During the coram nobis hearing, Beno testified that he entered a plea bargain on his client's behalf on July 16, 1981. The agreement, which was not disclosed to Womack prior to trial, was to the effect that Martin would get a life sentence, with parole, to be served concurrently with his existing life sentence. Beno also testified that he was present during a meeting between Martin and Montgomery County District Attorney Jimmy Evans. Martin had requested the meeting to inform Evans of Womack's innocence. Beno authenticated a partial transcript of the meeting as having been derived from the tape recording he made during the meeting with Evans. The meeting was held after Martin had given his grand jury testimony implicating Womack in the Bullock murder and after Martin had written the self-incriminating letter to his attorney, Beno. The transcript stated, in pertinent part:
"Mr Evans: All right, it is 12 minutes after 12 o'clock on Friday, July the 24th, 1981, in the chambers of the Grand Jury room, the Grand jury is not in session. Present herein is Honorable Bob Beno, Attorney for Neal Martin. Neal Martin is confined to Montgomery County Jail, having, ah, pled guilty to some . . .
"Mr. Beno: Three robberies.
"Mr. Evans: Three robbery charges, and awaiting transportation to the penitentiary. Where he will begin serving a life sentence. On July 23rd, at approximately 12:29 p.m. 1981, the District Attorney's Office received the following communication from Neal Martin: '142 Washington Avenue, Montgomery, Alabama, the Honorable James H. Evans, District Attorney, Montgomery, Alabama. My name is Neal Martin and I am an inmate here in the Montgomery County Jail charged with robbery. Sir, as you know I have valuable information *Page 53 
about the Bullock Murder case, I'm tired of suffering for someone else's mistakes and would like to talk with you personal [sic] about this matter, at your earliest convenience, or as soon as possible. Your consideration and cooperation will be greatly appreciated. Respectfully submitted, Neal Martin. . . .'
". . .
"Mr. Evans: All right, now Neal first of all I don't know, I don't have any, I don't know that you have valuable information about the Bullock case. Your Attorney, Mr. Beno, has made some very general statements with no specifics, uh, Mr. Bell, who represents Mr. Clarence Womack has made some general statements, but I want you to understand that I don't know what you know, if you know anything, and I don't, representations have been made to me that you might know something. All right. You have the right to remain silent, you have the right to not testify here, your lawyer has advised you against it. . . .
". . .
"Mr. Evans: All right. You know you have a right to remain silent, you have, you have a right to refuse to make any statements, any thing you say can and will be used against you in a court of law if you are implicated. And you can stop the questions, answering the questions at any time. Your lawyer has advised you not to answer any questions. Of course, to explain that, you generated this interview did you not? You asked to come down here.
"Neal Martin: Right.
"Mr. Evans: All right. Now. All right. Neal, Clarence Womack has been indicted for the murder of A.D. Bullock. Are you aware of that? Let me see, yes or no.
"Neal Martin: Yes sir.
". . .
"Mr. Evans: All right, You testified before the Montgomery County Grand Jury, uh, in regard to those proceedings, did you not?
"Neal Martin: Yes sir.
"Mr. Evans: Before we go any further, do you want, are you satisfied with the representation that you have as an attorney?
"Neal Martin: Yes sir.
"Mr. Evans: Do you want any other attorney to be here?
"Neal Martin: No sir.
". . .
"Mr. Evans: Has anybody offered you any kind of reward or hope of reward to get you to write me and say you want to see me.
"Neal Martin: No sir.
"Mr. Evans: All right, is what you're doing here today in this room talking to me, uh, are you aware of who I am and what I do for a living?
"Neal Martin: Yes, sir.
"Mr. Evans: All right, are you here voluntarily of your own free will and accord?
"Neal Martin: Yes sir.
"Mr. Evans: Do you want any other attorney to be here with you?
"Neal Martin: No sir.
"Mr. Evans: All right, uh, do you wish to have Mr. Beno here?
"Neal Martin: Yes sir.
"Mr. Evans: All right, ok. Now, uh, what is it Neal that you wanted to tell me?
"Neal Martin: That ya'll got Womack and Goat [Charles Johnson] up there on a murder case, which they, what they didn't do. And it didn't happen. It didn't happen like that. Ain't none of that, that ain't right, and I just, I just can't, I just couldn't let em go out like that.
"Mr. Evans: All right. Now. Uh, you [are] about to make some incriminating statements. At least in regard to the law of perjury. Did you know that's what you're about to do?
"Neal Martin: Ya.
". . .
"Mr. Evans: You are in, will be able to at some point to review your testimony before the Grand Jury, uh, I think the court would allow that, uh. I will make representations to you about what your testimony was as accurately as I can, not *Page 54 
having the tapes here. But I've got to make absolutely sure, I hate to keep beleaguering [sic] this point, but I got to make absolutely sure that you understand that any statement you make here today, ah, has to be free and voluntary on your own free will.
"Neal Martin: That is.
"Mr. Evans: All right.
"Mr. Beno: Let me explain, because Mr. Evans wants to make sure that you do understand.
"Neal Martin: Ya.
"Mr. Beno: That if your testimony before Mr. Evans today, which is being taped, is contrary to what you said before the Grand Jury there's a possibility of perjury charges being brought against you and since you've been convicted in other cases making you a habitual offender conviction of perjury, should those charges be brought, will lend themselves to your being placed in the penitentiary for life without parole. Do you understand that? At the discretion of the District Attorney, are you aware of that?
"Neal Martin: Yes, I'm aware of that.
". . .
"Mr. Evans: Or, now let me tell you something now what I said ah Mr. Martin concerning your rights, you don't have to submit to any kind of questions. If you don't want this under oath then we won't put it under oath. But your statements that you make if they are incriminating they still can and will be used against you in a court of law if you are charged with an offense. Do you understand that? And that you don't have to answer any questions under oath or not under oath. That you have a right to be represented by a counsel, and Mr. Beno is here, and he's advised you against this. You have, if you don't like him you can get another lawyer. You can talk to me without a lawyer but it's all got to be free and voluntary on your part. I, ah, I'm not going to be in a position of, of letting off the record mean one thing to you and then one thing to me. You understand?
"Neal Martin: Um hum.
"Mr. Evans: So what I'm saying is if you want to proceed today without being under oath and just give a statement not under oath to us, then ah, if you want to do that then we'll proceed here today with the understanding that you know that it is voluntary on your part and that all those rights that I gave you apply to those statements, do you understand that?
"Mr. Beno: What he is telling you Neal, is to be aware that whether it's under oath or not under oath if you're incriminated by your statements he can and possibly will charge you with the crime which your statements incriminate you with. Is that correct Mr. Evans? Uh, is that correct Mr. Evans?
"Neal Martin: No, I ain't, that's all right I don't need that. Uh, I'll just take the life I don't need that. Huh. I won't talk. I don't want to talk about nothing.
"Mr. Evans: Well. . . . What I'm telling you, what I'm telling you is Neal that you're down to tell me something. You [have] been a witness before the Grand Jury. You've already testified against Clarence Womack. Now, you are down here saying Clarence Womack ain't guilty.
"Neal Martin: He ain't guilty.
"Mr. Evans: All right, now hang on just a minute. Just a minute. By doing that you place yourself in the position of being under scrutiny, under investigation, for perjury. Do you understand that? See what I'm talking about? Now I know that you would like to make some kind of deal with me to get your testimony.
"Neal Martin: No, I don't need that. I got life, I, I don't need that.
"Mr. Evans: But, but I'm not in a position to make any deals with you, but if you want to give me information, I want to take it.
"Neal Martin: No, I just want to be done right. You know, right is right. And wrong is wrong.
"Mr. Evans: But o.k. but before you, if you want to do what's right then that's what I'm trying to do. I'm trying to tell you that any statement that you make can, *Page 55 
will, and will be used against you in a court of law if a Grand Jury returns an indictment. You can't be tried unless a Grand Jury indicts you. And that's all I'm saying.
". . .
"Mr. Beno: Whether or not you'll be indicted. But I, the things you say in here, with my knowledge of what you would be saying, indicate to me that Mr. Evans would have a right, certainly have a right to bring your case before the Grand Jury on uh, perjury and possibly other uh, . . .
"Neal Martin: Murder.
"Mr. Beno: Possibly murder.
"Neal Martin: No not me. . . . That's all right I, I close this.
"Mr. Evans: All right.
"Neal Martin: Thank you.
"Mr. Evans: Thank you."
The transcript, which was transcribed by the district attorney's office and was presumably, therefore, a part of that office's file regarding the Womack case, can easily be construed as an effort by the district attorney to convince Martin to maintain his silence and to prevent him from recanting his earlier testimony before the grand jury. Bell testified at the coram nobis hearing that the transcript was not produced before trial.
Maurice Bell called Martin to testify at Womack's trial, presumably to elicit inconsistencies with his prior testimony at the suppression hearing. On cross-examination, the State's attorney sought to elicit the substance of Martin's testimony from the grand jury proceeding in the following manner:
"BY MR. WILLIAMS:
 "Q. Mr. Martin, isn't it a fact that you told more than one member of the Montgomery Police Department that Clarence Womack killed Arthur Bullock?
 "MR. ALLEN [on behalf of Martin]: We respectfully decline to answer on the grounds it may tend to incriminate us in a criminal action.
"THE COURT: Is that your answer?
"THE WITNESS: Yes, sir.
"THE COURT: All right.
 "Q. Mr. Martin, isn't it also a fact that you testified before the Montgomery Grand Jury — wasn't it your sworn testimony that Clarence Womack killed Arthur Bullock?
 "MR. ALLEN: We respectfully decline to answer on the grounds that it may tend to incriminate us in a criminal action.
". . .
 "Q. Mr. Martin, let me ask you these questions. Isn't it true that you told the Montgomery Police Department that Rex Jones and you and Neal Martin — I mean, Rex Jones and Charles Johnson and Clarence Womack were all together on that Monday afternoon?
 "MR. ALLEN: We respectfully decline to answer on the grounds it may tend to incriminate us a criminal action.
"THE WITNESS: Right.
 "Q. Isn't it true that y'all all were together at a dope house on that afternoon?
 "MR. ALLEN: We respectfully decline to answer, Your Honor, on the grounds that it may tend to incriminate us in a criminal action.
"THE COURT: Is that your answer?
"THE WITNESS: Right.
 "Q. Isn't it true that you told the Montgomery Police Department that Clarence Womack said on that afternoon that he had been on a lick?
 "MR. ALLEN: We respectfully decline to answer, Your Honor, on the grounds that it may tend to incriminate us in a criminal action.
 "Q. Isn't it true, Mr. Martin, that you told the Montgomery Police Department that Clarence Womack stated to you that the man wouldn't open the safe and [he] had to shoot him?
 "MR. ALLEN: We respectfully decline to answer, Your Honor, on the grounds that it may tend to incriminate us in a criminal action.
"THE WITNESS: Right.
 "Q. Isn't it true, Mr. Martin, that you told the Montgomery Police Department that Clarence Womack said he didn't *Page 56 
know whether or not he had killed Mr. Bullock?
 "MR. ALLEN: We respectfully decline to answer, Your Honor, on the grounds that it may tend to incriminate us in a criminal action.
"THE WITNESS: Right."
The impropriety of this line of questioning by the State was aggravated by the fact that the State failed to produce Martin's grand jury testimony after several attempts by Maurice Bell to compel its production and after the State agreed to provide the transcript of his grand jury testimony pursuant to a pre-trial order signed by the circuit judge.
The State's other key witness, both before the grand jury and at the trial, was Rex Jones. Although the State had, in essence, entered into a plea bargain with Jones prior to Womack's trial, it suppressed all evidence of such an arrangement. Jones, who was at the time of Womack's trial a habitual offender under Alabama law, gave his testimony in exchange for a tacit promise of leniency on four robberies with which he was charged.
Charles Law, who was the defense attorney for Rex Jones during the relevant period, explained at the coram nobis hearing the details of the plea bargain that he had made on Jones's behalf. Law agreed that Jones would testify against Womack if he would receive 10 years on each robbery he was charged with, to be served concurrently. Under the habitual offender law applicable at the time, Jones's sentence would have been life without parole, were he convicted of any felony. Law made the agreement with Assistant District Attorney John Bell on the condition that Jones would not be informed of the details of the plea bargain. Law merely told Jones, "It would not hurt you [to testify against Womack] and the judge would take it into consideration at the sentencing." Law also testified at the coram nobis hearing, "[I] made a specific point not to tell him that I was negotiating with the D.A., nor that I had a deal because the district attorney made that a condition of my making the deal, that I not tell him, because it would taint his testimony at the capital murder case."
Evidence of the arrangement was confirmed by Neal Martin's testimony at trial. Maurice Bell elicited the following from Martin on direct examination:
 "Q. Do you know whether or not Rex Jones has been sentenced for those robberies?
"A. No, he haven't.
"Q. He has not?
"A. No.
 "Q. Do you know whether or not Rex Jones has been promised any reward by testifying in this case?
"A. Yes, he has.
"Q. He has?
"A. Yes.
 "Q. Has Rex Jones told you what that reward would be to testify against Clarence Womack?
"A. Yes, sir.
"Q. What did he say?
 "A. Ten years on all three of the counts of robbery running together.
"Q. Is that what he said that he would get?
"A. Three ten-year sentences.
". . .
 "Q. What you're saying is that if Rex Jones testifies in this case favorably to the State, the Prosecution, that he will receive ten year sentences; is that correct?
"A. Right.
"Q. For the robberies?
"A. Right.
 "Q. Would that be concurrent or consecutive? "A. Concurrent, running together.
"Q. Did Rex Jones tell you that?
"A. Right.
"Q. Did anyone else tell you that?
"A. Yes, sir.
"Q. Who?
"A. R.T. Ward."
The existence of that plea bargain is also clarified by petitioner's Exhibit 8 at the coram nobis hearing, which is a recommendation on sentencing of Rex Jones on his *Page 57 
four robbery cases and which was executed the day before he gave his grand jury testimony against Womack. The document, which was drafted by the district attorney's office and authenticated by Officer Terry Ward at the coram nobis hearing, stated the following:
 "6-4-81, Terry says 10 years C.C. on all cases is what M.P.D. wants since defendant is helping on a murder case, Bullock, and has turned numerous other cases. 6-81 [sic] agreed with Charles Law that if we were satisfied that defendant was testifying truthfully and was co-operating that we would follow M.P.D. recommendation."
Maurice Bell testified at the coram nobis hearing that he was not provided with any evidence of the plea bargain with Jones or the district attorney's recommendation on sentencing prior to Womack's trial.
Rex Jones's record indicates that he pleaded guilty to four robberies in the first degree on July 16, 1981, shortly after Jones's grand jury testimony against Womack. However, he was not sentenced until June 1984, well after his testimony at Womack's trial. Jones was sentenced to ten years in the penitentiary, with credit for all time served since his arrest on February 4, 1981, just as Martin predicted at trial. In a letter to the commissioner of the Board of Corrections, the circuit judge who sentenced Jones explained that Jones was a material prosecution witness in Womack's trial and "according to the Montgomery County District Attorney's Office, very material in obtaining a capital conviction against Womack."
The assistant district attorney who tried the case aggravated the suppression of the plea bargain by his reference to the lack of such a bargain with Rex Jones in his closing argument. In closing, the prosecutor said the following regarding Rex Jones's cooperation and testimony against Womack: "I think anybody who's going to spend the rest of his life in the penitentiary knows what happens to informants. Y'all can guess what's going to happen to Mr. Jones. I think you'll probably be reading about it in the paper within the next six months. I submit to you because he knew what was — he knew what his sacrifice was, you might think it's a little more believable." This argument represented an attempt to affirmatively mislead the jury into believing that no such bargain had been made with Jones.
The prosecution also suppressed an interoffice memorandum between Investigator Bob Bryant and Assistant District Attorney Ellen Brooks dated September 9, 1981, which exculpated Womack. The memo stated the following regarding the Bullock murder:
 "Today Will Gunter requested us to talk with his client, Robert Glenn, regarding the above case. Glenn, who is an ex-felon and is presently under three indictments which Mike Broom is handling, was a cellmate of Rex Jones and Neal Martin. Glenn says Jones and Martin admitted to killing Bullock and taking 2 rings. Glenn says they gave the rings to a man to keep for them and Glenn knows who it is. Of course, Glenn wants his cases [nol-prossed] in exchange for the information.
 "Apparently Will has told this to MPD also. T.H. Roper is involved for MPD.
 "It seems we should talk with Glenn to see if he does in fact have some information. Then we can discuss with MPD, Evans, etc. whether anything should be offered to Glenn."
Maurice Bell testified at the coram nobis hearing below that not only was he unaware of this memorandum, which was part of the district attorney's file on Womack, but he was also unaware of the existence of Robert Glenn or the substance of his testimony.
 II.
We now turn to a discussion of the law regarding suppression by the State of exculpatory evidence. Prior to trial, Womack's defense attorney, Maurice Bell, filed a motion for discovery with the Montgomery County circuit clerk. Bell moved the court to require the district attorney to make available, among other things: *Page 58 
 "All exculpatory or otherwise favorable information as provided in cases such as Brady v. Maryland, 373 U.S. 83 [83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)], Giles v. Maryland, 386 U.S. 66
[87 S.Ct. 793, 17 L.Ed.2d 737 (1967)], Giglio v. U.S. [405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104
(1972)], and Williams v. Dutton, 400 F.2d 797 (5th Cir. 1978).
 "Statements of all persons including memoranda, summaries, recordings, etc. of any written or oral statements of any person, made to any law enforcement officer or the investigative staff of any prosecutor in any way connected with the above styled cause.
 "All written and recorded statements and all summaries or memoranda of any oral or written statements made by the named Defendant and all other Defendants named in the crime which was made the basis of this indictment."
Bell then alleged that all such requested information was necessary to assure Womack due process of law as guaranteed by Article I, Section VI, of the Constitution of the State of Alabama and the Fifth Amendment of the Constitution of the United States of America, which is applicable to the State through the Fourteenth Amendment. Bell further alleged that without such information Womack would be denied the right to counsel, which is guaranteed under Article I, Section VI, of the Constitution of the State of Alabama and the Sixth Amendment of the Constitution of the United States of America, which is applicable to the State through the Due Process Clause of the Fourteenth Amendment. Further, Bell asked for alternative relief: that if the court did not grant his motion in its entirety, then it would conduct an in camera examination of all of the requested information and make available for reproduction any of the information that the court determined to be favorable to Womack's defense on the questions of guilt or punishment.
Further, the pre-trial order, which was signed by the circuit judge, contained the following:
 "Any and all statements made by Rex Jones, Neal Martin and Charles 'Nanny Goat' Johnson to law enforcement authorities shall be produced to the court in chambers at 10:00 a.m. on May 17, 1982, for in camera inspection by the court.
 "The State having agreed to provide for listening and inspection taped recordings of statements or conversations made by James R. Williams and Neal Martin to the police, the Motion for Production of these statements is DENIED as moot.
". . .
 "The State having agreed to provide a transcript of Neal Martin's testimony before the grand jury to defendant, the Motion for Production of said transcript is denied as moot."
As we stated earlier, none of the exculpatory or impeachment evidence discussed above was produced prior to trial.
In Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196,10 L.Ed.2d 215 (1963), the United States Supreme Court held: "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady was a capital murder case where the prosecution withheld evidence of an extra-judicial statement by a co-defendant in which the co-defendant admitted he had personally committed the murder. Although Mr. Brady took the stand in his own behalf and admitted his participation in the crime, he contended that his co-defendant performed the actual murder. The prosecutor, in closing arguments, contended that Brady was guilty of murder in the first degree but urged the jury to return its verdict "without capital punishment." 373 U.S. at 84, 83 S.Ct. at 1195.
The Court in Brady relied on Mooney v. Holohan, 294 U.S. 103,55 S.Ct. 340, 79 L.Ed. 791 (1935), in holding that the standards of justice do not comport with the suppression of evidence which, if disclosed, "would tend to exculpate" the defendant. 373 U.S. at 88, 83 S.Ct. at 1197. In Mooney,294 U.S. at 112-13, 55 S.Ct. at 341-42, *Page 59 
the Court said the following of the requirement of due process:
"That requirement, in safeguarding the liberty of the citizen against deprivation through the action of the State, embodies the fundamental conceptions of justice which lie at the base of our civil and political institutions. Hebert v. Louisiana,272 U.S. 312, 316, 317 [47 S.Ct. 103, 104, 104, 71 L.Ed. 270
(1926)]. It is a requirement that cannot be deemed to be satisfied by mere notice and hearing if a State has contrived a conviction through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony known to be perjured. Such a contrivance by a State to procure the conviction and imprisonment of a defendant is as inconsistent with the rudimentary demands of justice as is the obtaining of a like result by intimidation. And the action of prosecuting officers on behalf of the State, like that of administrative officers in the execution of its laws, may constitute state action within the purview of the Fourteenth Amendment."
In United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392,49 L.Ed.2d 342 (1976), the United States Supreme Court explained that this guarantee of due process under the Fifth Amendment — that exculpatory evidence will not be withheld by the prosecution — applies in three different situations.
The first instance is illustrated by Mooney v. Holohan,supra. Denial of due process will be found where the prosecution withholds evidence that demonstrates that the prosecution's case relies, in whole or in part, on perjured testimony and that the prosecution knew, or reasonably should have known, of the perjury. "[T]he Court has consistently held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." Agurs,427 U.S. at 103, 96 S.Ct. at 2397 (footnotes omitted), citing Pyle v.Kansas, 317 U.S. 213, 63 S.Ct. 177, 87 L.Ed. 214 (1942);Alcorta v. Texas, 355 U.S. 28, 78 S.Ct. 103, 2 L.Ed.2d 9
(1957); Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173,3 L.Ed.2d 1217 (1959); Miller v. Pate, 386 U.S. 1, 87 S.Ct. 785,17 L.Ed.2d 690 (1967); Giglio v. United States, 405 U.S. 150,92 S.Ct. 763, 31 L.Ed.2d 104 (1972); and Donnelly v.DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431
(1974).
The second instance, according to the Court inAgurs, is illustrated by Brady v. Maryland and involves a pretrial request for specific information. According to theAgurs analysis, there is an implicit requirement of materiality in a finding of denial of due process for suppression of evidence under Brady:
 "Although there is, of course, no duty to provide defense counsel with unlimited discovery of everything known by the prosecutor, if the subject matter of such a request is material, or indeed, if a substantial basis for claiming materiality exists, it is reasonable to require the prosecutor to respond either by furnishing the information or by submitting the problem to the trial judge. When the prosecutor receives a specific and relevant request, the failure to make any response is seldom, if ever, excusable."
Agurs, 427 U.S. at 106, 96 S.Ct. at 2399.
The third instance in which due process compels the divulgence of exculpatory material encompasses both the situation where a general request for "all Brady material" or "all exculpatory or otherwise favorable information," such as Bell made in his motion for discovery, and the situation where no request for exculpatory evidence is made at all. As the Court explained in Agurs, 427 U.S. at 110, 96 S.Ct. at 2401, "[T]here are situations in which evidence is obviously of such substantial value to the defense that elementary fairness requires it to be disclosed even without a specific request." The prosecutor "is the 'servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer.'Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 633,79 L.Ed. 1314 (1935). This description of the prosecutor's duty illuminates the standard *Page 60 
of materiality that governs his obligation to disclose exculpatory evidence." 427 U.S. at 111, 96 S.Ct. at 2401. The standard to be applied in such cases is not as stringent as that applied to newly discovered evidence, but neither does it mandate that the prosecutor routinely deliver his file to the defense.
 The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt. Such a finding is permissible only if supported by evidence establishing guilt beyond a reasonable doubt. It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record."
Agurs, 427 U.S. at 112, 96 S.Ct. at 2401. We note that the State contends that the proper standard is enunciated in UnitedStates v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383,87 L.Ed.2d 481 (1985). Part III of Bagley, upon which the State relies, is not the opinion of the Court, as the State contends, but the opinion of Justice Blackmun, which was not adopted by the Court.
 III. A.
Because the present case involves all three of the situations delineated in Agurs, each will be discussed in turn. The first aspect of the present case involves the State's use of the testimony of Rex Jones and Neal Martin even though the State had reason to believe that testimony was perjured. This situation was characterized by the Supreme Court in Mooney,294 U.S. at 110, 55 S.Ct. at 341: "[T]he sole basis of his conviction was perjured testimony which was knowingly used by the prosecuting authorities in order to obtain that conviction, and also . . . these authorities deliberately suppressed evidence which would have impeached and refuted the testimony thus given against him."
Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763,31 L.Ed.2d 104 (1972), is illustrative of the first category under the Agurs classification discussed above. Giglio was a forgery case in which the co-conspirator, who was a bank teller for Manufacturers Hanover Trust Company, was the only witness to link the petitioner to the forgery. The co-conspirator explained the mechanics of the crime to the F.B.I. and related that story to the grand jury, which indicted the petitioner. Although defense counsel sought at trial to impeach the co-conspirator's testimony on the basis that he had been promised leniency, the co-conspirator denied the existence of any such promise. Furthermore, in closing argument, the prosecutor stated that the co-conspirator had not received any promises that he would not be indicted.
The Government confirmed, however, in an affidavit filed as part of its opposition to new trial, that an assistant prosecutor had promised the co-conspirator that he would not be prosecuted if he testified against the petitioner before the grand jury and at trial. A new trial is required, the Court said in Giglio, 405 U.S. at 154, 92 S.Ct. at 766, " 'if the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury.' " Quoting Napue v.Illinois, 360 U.S. 264, 271, 79 S.Ct. 1173, 1178,3 L.Ed.2d 1217 (1959). Because the Government's case relied almost entirely on the testimony of the co-conspirator, and especially since there could have been no indictment without his testimony, his "credibility as a witness was therefore an important issue in the case, and evidence of any understanding or agreement as to a future prosecution would be relevant to his credibility and the jury was entitled to know of it."Giglio, 405 U.S. at 154-55, 92 S.Ct. at 766. Because the prosecution suppressed the existence of the promise, the Court concluded that due process requirements, as explained in Napue
and Mooney, supra, required that the conviction be reversed and the case remanded for a new trial.
The rationale in Giglio and Mooney applies directly to the present case. There was voluminous evidence presented at the coram nobis hearing to the effect that the district attorney's office had negotiated a *Page 61 
plea bargain with both Neal Martin and Rex Jones before their grand jury testimony, but failed to disclose those plea bargains to Womack's attorney.
Robert Beno, Neal Martin's defense attorney regarding the three robbery charges pending against him at the time of Womack's trial, testified at the coram nobis hearing that he entered a plea bargain on his client's behalf on July 16, 1981. The State promised leniency in exchange for Martin's testimony before the grand jury and his promise to cooperate with the district attorney at trial. Martin, in a letter sent to Beno after he gave his grand jury testimony but before Womack's trial, confirmed the existence of the agreement with the authorities. Beno likewise confirmed at the coram nobis hearing that Martin was aware that a plea bargain was in the making when he gave his grand jury testimony.
The existence of a plea bargain with Rex Jones at the time of his grand jury testimony was, likewise, well documented. Charles Law, who was Jones's defense attorney in regard to the four robberies pending against him at the time of Womack's trial, testified at the coram nobis hearing regarding the existence and details of the State's bargain with Jones. Law explained that Jones agreed to testify if he could be guaranteed 10 years on each robbery charge, to be served concurrently. Law said that he made the deal with assistant district attorney John Bell on the condition that Jones would not be informed of the details. Jones was simply told that it would not hurt to testify and that "the judge would take it into consideration at sentencing." The existence of the arrangement was inadvertently revealed at Womack's trial by Neal Martin, who said that he did not personally have a deal with the district attorney but that Jones had been promised "ten years concurrent." Jones was not sentenced until well after Womack was convicted, but was given 10 years on each robbery to be served concurrently, as Martin had prophesied.
Just as in Giglio, the prosecutor aggravated the prejudicial effect of suppression of the plea bargain by affirmatively representing to the jury that Jones had no deal with the State. In closing argument, the assistant district attorney not only implied that Jones risked sacrificing his life in order to give his testimony regarding the Bullock murder, but also told the jury that Jones would spend the remainder of his life in prison.
There can be no doubt that the suppression of this impeachment evidence could have affected the judgment of the jury. Jones and Martin were the key witnesses before the grand jury and their testimony was necessary for an indictment. At trial, they were the only witnesses who could tie Womack to the crime. Their veracity and motive for testifying were crucial considerations for the jury in weighing the evidence. As the Supreme Court said in Napue, 360 U.S. at 269, 79 S.Ct. at 1177:
 "The principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness. The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend."
It is evident that the jury considered the possibility of an agreement with Jones to be relevant, because during deliberations the jury questioned the court about the customary period between accepting a guilty plea, as the State had done in Jones's case, and sentencing, which had not yet occurred. The suppression of information about Jones's plea bargain violates Womack's guarantee of due process under the Fourteenth Amendment to the Constitution of the United States. The standard in this regard was stated by the United States Supreme Court in De Marco v. United States, 415 U.S. 449, 450,94 S.Ct. 1185, 1185, 39 L.Ed.2d 501 (1974), "Unquestionably, had there been a promise to the witness prior to his testimony, Giglio v.United *Page 62 States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), andNapue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217
(1959), would require reversal of petitioner's conviction." Because the State knowingly suppressed evidence of the plea bargains with Martin and Jones, and affirmatively misrepresented that such arrangements did not exist, the conviction of Womack is due to be reversed for denial of due process.
Certainly the most egregious violation of Womack's constitutional guarantee of due process involves the suppression of Neal Martin's proffered evidence that he had been the "look out man" on the robbery and that Jones had committed the murder. Although Martin's attorney, Robert Beno, did inform Maurice Bell generally that he had exculpatory evidence regarding the Bullock murder, which was protected by the attorney-client privilege, we pretermit that discussion until we address the ineffective-assistance-of-counsel argument. In any event, failure of defense counsel to discover exculpatory evidence does not absolve the State from its obligation to produce such clearly exculpatory evidence.
The fundamental unfairness inherent in allowing the prosecutor to suppress impeachment evidence is apparent under the standard in Napue enunciated above. The strictest standard of materiality applies to the knowing suppression of exculpatory or impeachment evidence. As the Supreme Court said of knowing use of perjured testimony in Agurs, 427 U.S. at 103
n. 7, 96 S.Ct. at 2397 n. 7:
 "It [due process] is a requirement that cannot be deemed to be satisfied by mere notice and hearing if a State has contrived a conviction through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony known to be perjured. Such a contrivance by a State to procure the conviction and imprisonment of a defendant is as inconsistent with the rudimentary demands of justice as is the obtaining of a like result by intimidation."
Quoting Mooney v. Holohan, 294 U.S. at 112, 55 S.Ct. at 342
(1934).
The duty of the prosecutor is not strictly adversarial to the defense. As the Supreme Court said in United States v. Bagley,473 U.S. 667, 675, 105 S.Ct. 3375, 3379, 87 L.Ed.2d 481 (1985), the prosecutor " 'is the representative not of an ordinary party to a controversy, but of a sovereignty . . . whose interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done,' " quoting Bergerv. United States, 295 U.S. 78, 88, 55 S.Ct. 629; 633;79 L.Ed. 1314 (1935). The very concept of ordered liberty in a civil society mandates not only that the innocent be acquitted but that evidence in possession of the State that vitiates the indictment of a crime be disclosed.
Powell v. Wiman, 287 F.2d 275 (5th Cir. 1961), is an analogous case where the State suppressed evidence which, if known, would not have allowed a conviction. The Fifth Circuit explained in Powell that the State's suppression of substantial evidence from the jury that tended to prove the insanity of its key witness did not comport with the high standard applicable to State prosecuting attorneys. The duty of a State prosecutor, as the court explained in Powell, is as follows: "[H]e is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor-indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." 287 F.2d at 279. Quoting Berger v.United States, 295 U.S. at 88, 55 S.Ct. at 633.
Not only did the district attorney have strong reason to disbelieve Martin's grand jury testimony, in light of his admissions against interest at the meeting, but his assistant used that testimony at trial.
Although the State did not call Martin as its witness at trial, the prosecutor's obligation to the court, as an officer *Page 63 
of the court and in deference to the rights of the accused, is to disclose that evidence which clearly exculpates the defendant. The State abdicated that responsibility when it withheld the exculpatory evidence that Martin offered to Evans. Maurice Bell, in his motion for discovery, requested all exculpatory material under Brady and Giglio and specifically requested all exculpatory statements to law enforcement or prosecutorial agencies. The district attorney, as a representative of the sovereign, should have disclosed Martin's statement prior to trial.
There can be no doubt in the present case that the suppression of the statement given by Martin, one of two key witnesses in the State's case against Womack, is sufficient to meet the Giglio standard quoted above. Therefore, we conclude that the State denied Womack's fundamental rights and thus "constitutional error" occurred when it suppressed Martin's exculpation of Womack and used at trial Martin's grand jury testimony that he had attempted to recant. As the United States Supreme Court held in United States v. Bagley, 473 U.S. 667,678, 105 S.Ct. 3375, 3381, 87 L.Ed.2d 481 (1985), "constitutional error occurs . . . if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial." Because the suppression of Martin's exculpatory statement could have, and certainly did, affect the judgment of the jury, we must reverse the judgment below under the requirements of due process.
 B.
The second situation where due process compels disclosure under the Agurs test is illustrated by Brady v. Maryland,373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In Brady, the defense counsel in a murder case specifically requested production of all extrajudicial statements made to the prosecution by the accomplice. Although the prosecution produced some of the extrajudicial statements, it withheld the accomplice's confession to the actual murder. The Supreme Court held that suppression of favorable evidence "upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. at 1196.
The Supreme Court explained in Agurs, 427 U.S. 97,96 S.Ct. 2392 (1976), that a finding of materiality is an implicit requirement in Brady. As the Court said in Agurs,427 U.S. at 106, 96 S.Ct. at 2399, "[I]f the subject matter of such a request is material, or indeed if a substantial basis for claiming materiality exists, it is reasonable to require the prosecutor to respond either by furnishing the information or by submitting the problem to the trial judge. When the prosecutor receives a specific or relevant request, the failure to make any response is seldom, if ever, excusable." The standard for determining "materiality" was enunciated in Brady
as anything "which, if made available, would tend to exculpate him or reduce the penalty." 373 U.S. at 87-88,83 S.Ct. 1196-1197.
The issue to be determined in this regard is whether the police reports, which were specifically requested by Womack, were material in the sense that they would tend to exculpate Womack. The supplementary police reports of February 5 by Officer Vaillancourt and that of February 19 by D.H. Carmichael contradicted one another in regard to when and where Womack met with Jones and Martin on the date of the crime. They were also inconsistent in regard to whether the robbery was foiled by the appearance of the little girl and whether Jones claimed that Womack actually committed a robbery. These statements are material to Womack's defense, because they provide an opportunity to impeach both Jones and Martin regarding the circumstances surrounding the crime. The same standard of materiality and the same due process requirements apply whether the evidence is for impeachment or exculpation. United Statesv. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), and Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763,31 L.Ed.2d 104 (1972).
Furthermore, the supplementary police report of February 5 indicated that both *Page 64 
Jones and Martin identified Ralph Miller as Womack's accomplice in the crime. It was established during subsequent police investigations that Miller was innocent of any involvement in the murder and was in fact verified to have been at work that day. Charles "Nanny Goat" Johnson was later alleged by Martin and Jones to have been Womack's accomplice in the crime. Because Martin and Jones were the key witnesses tieing Womack to the crime, the impeachment evidence regarding their testimony to the jury, which related to the operative facts of the crime, is, by its very nature, material evidence that tends to exculpate Womack. Due process requires disclosure of such evidence, upon request, when it would tend to exculpate the accused or to impeach the veracity of a State's witness.United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375,87 L.Ed.2d 481 (1985); United States v. Agurs, 427 U.S. 97,96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); and Brady v. Maryland,373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). As this Court said in Ex parte Watkins, 509 So.2d 1064, 1066 (Ala. 1984), "The critical test, therefore, is whether 'the suppressed evidence might have affected the outcome of the trial.' " Quoting Agurs, 427 U.S. at 104, 96 S.Ct. at 2397. See also Exparte Kimberly, 463 So.2d 1109 (Ala. 1984). Because the undisclosed police reports tend to exculpate Womack, the State's failure to produce them constitutes a violation of the requirements of due process and we must reverse.
 C.
The third aspect of the Agurs case involves the situation where no request, or a general request for all Brady material, is made. The Supreme Court explained in Agurs that the Due Process Clause of the Fifth Amendment, which applies to the states through the Fourteenth Amendment, imposes a duty on the prosecutor to volunteer certain exculpatory matter to the defense even in the absence of a request. The court explained that the standard of materiality in regard to such evidence must reflect the overriding concern of the sovereign that "justice shall be done." 427 U.S. at 111, 96 S.Ct. at 2401. "[I]f the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed."Agurs, 427 U.S. at 112, 96 S.Ct. at 2402. As the Court explained in Agurs, such a standard necessitates that the omitted evidence be viewed in light of the entire record.
In the present case the State withheld the transcript of the meeting between district attorney Jimmy Evans and Neal Martin, wherein Martin recanted his grand jury testimony and cast doubt on Womack's guilt. Such testimony by a key witness for the State certainly "creates a reasonable doubt" about the guilt of Womack under part three of the Agurs analysis. Under the circumstances here, the prosecution's knowing reliance on Martin's recanted testimony also denied due process under part one of the Agurs test, as was discussed earlier.
The other aspect of this denial of due process involves the suppression of Neal Martin's grand jury testimony itself. Because the State had evidence that Martin had committed perjury before the grand jury, it was incumbent upon the State to produce not only the statement indicating that perjury had been committed but the apparently perjured grand jury testimony as well. The grand jury testimony was not merely a component of the indictment; it was necessary for the State to go forward with the prosecution of Womack. Both Martin and Jones testified before the grand jury that Womack approached them on the street and told them he had robbed Bullock and murdered him. Impeachment of Neal Martin's grand jury testimony would necessarily impeach Rex Jones's corroboration of the facts and could cause the whole house of cards to tumble.
The Supreme Court in Agurs cited a very similar fact situation in which the suppression of evidence would necessitate reversal, even in the absence of a request for the exculpatory information. "If, for example, one of only two eyewitnesses to a crime had told the prosecutor that the defendant was definitely not its perpetrator and if *Page 65 
this statement was not disclosed to the defense, no court would hesitate to reverse a conviction resting on the testimony of the other eyewitness." Agurs, 427 U.S. at 112-13, n. 21,96 S.Ct. at 2402, n. 21. The law applicable in this situation could not be any more certain.
When Martin came forward with his statement indicating that the grand jury testimony was perjured, it was incumbent upon the prosecutor to produce not only Martin's new exculpatory testimony, but also the retracted testimony upon which the indictment relied, as well. The significance of such evidence to the defense in preparation for trial is easily understood when the whole record is considered. Depriving the defense of such evidence is a violation of the guarantee of due process under the Fourteenth Amendment because it creates a reasonable doubt about the guilt of Womack that did not otherwise exist.Agurs, 427 U.S. at 112, 96 S.Ct. at 2401. Because the State knowingly suppressed the clearly exculpatory transcript of the meeting between the district attorney and Martin and likewise suppressed Martin's grand jury testimony, Womack's conviction is due to be reversed for violation of the guarantee of the Due Process Clause of the Fourteenth Amendment.
The final aspect of the State's suppression of exculpatory evidence involves the "Robert Glenn Memorandum." This was an interoffice memo in the district attorney's file that indicated that both Rex Jones and Neal Martin admitted committing the Bullock murder to their cellmate, Robert Glenn. Maurice Bell indicated at the coram nobis hearing that he was unaware of the memorandum and also unaware of the existence of Robert Glenn or the substance of his testimony.
The dispositive issue in this regard is whether this evidence is of such substantial value that fundamental fairness mandates its disclosure even without a request from defense counsel. Although a higher standard of materiality applies in cases where a request is made, this Court concludes that the suppression of the memorandum is of sufficient gravity to justify a finding of constitutional error. As the Supreme Court said in Agurs, 427 U.S. at 113, 96 S.Ct. at 2402, "[I]f the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt."
Viewed in light of some of the clear constitutional violations committed by the State, the suppression of the Glenn memorandum may seem trivial. When this suppression of evidence is viewed in the light of Womack's circumstances at trial, however, its true significance is apparent. This memorandum would have provided the defense with concrete evidence to impeach both Jones and Martin. It would also have provided the defense the opportunity to show the jury the true motive for Jones's and Martin's testimony. As the court explained inBagley, 473 U.S. at 676, 105 S.Ct. at 3380, exculpatory evidence as well as impeachment evidence falls within the ambit of the Brady rule. "The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend." Napue v. Illinois,360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959).
In finding that this impeachment evidence would have been material to the defense, this Court does not intend to encourage a combing of the prosecution's files for impeachment or exculpatory evidence in hopes of discovering error after an unsuccessful trial. To the contrary, the standard enunciated by the United States Supreme Court, and applied in this case, does not apply to inconsistencies that become apparent only after "flyspecking" the record. "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." Agurs,427 U.S. at 109-10, 96 S.Ct. at 2400-01. There must be a specific showing that the withheld evidence was material to the defense at the time of trial. Constitutional error occurs "if the evidence is material in *Page 66 
the sense that its suppression undermines confidence in the outcome of the trials" Bagley, 473 U.S. at 678,105 S.Ct. at 3381. Because the State suppressed the memorandum, which could have been used to impeach both Jones and Martin and show interest and bias in their testimony, we must reverse Womack's conviction for denial of due process under the Fourteenth Amendment.
 IV.
Petitioner also contends that his Sixth Amendment right to counsel, which applies to the states through the Due Process Clause of the Fourteenth Amendment, was violated because of ineffective assistance of counsel. Womack argues that his defense was prejudiced by his counsel's representation in several ways: first, Maurice Bell, Womack's trial attorney, voluntarily took the stand on his client's behalf and gave testimony tending to disprove the very defense that he relied upon; second, Bell knew of persons whose testimony would be favorable but failed to call them as witnesses; third, Bell conducted an inadequate pretrial investigation; fourth, Bell called witnesses to the stand even though he knew they would testify favorably to the State.
In Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052,80 L.Ed.2d 674 (1984), the Supreme Court enunciated the proper standard for determining whether the Sixth Amendment right to effective assistance of counsel has been violated. The Court explained that the defendant must prove both parts of the following test:
 "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."
Strickland, 466 U.S. at 687, 104 S.Ct. at 2064.
The first prong of the Strickland test is that "the defendant must show that counsel's representation fell below an objective standard of reasonableness." 466 U.S. at 688,104 S.Ct. at 2064. The court explained that this prong of the test does not impose specific guidelines but rather implies fulfillment of the basic duties of the attorney, to assist the client and to be a loyal advocate of the client's position. Likewise, the Supreme Court explained that an attorney has a duty to "bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process." 466 U.S. at 688,104 S.Ct. at 2065, citing Powell v. Alabama, 287 U.S. at 68,53 S.Ct. at 63. "Moreover, the purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation, although that is a goal of considerable importance to the legal system. The purpose is simply to ensure that criminal defendants receive a fair trial." 466 U.S. at 689, 104 S.Ct. at 2065.
The Court went on to explain that judicial scrutiny of counsel's performance must be highly deferential, avoiding the lure of 20/20 hindsight, and must adopt counsel's perspective at the time of trial. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." 466 U.S. at 689,104 S.Ct. at 2065. Because of the diverse methodologies employed by defense counsel and the broad range of opinion about how to best address a particular situation, the burden is upon the defendant to overcome the presumption that the challenged action constitutes "sound trial strategy." Michel v. Louisiana,350 U.S. 91, 101, 76 S.Ct. 158, 164, 100 L.Ed. 83 (1955). The court must determine whether,
 "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make *Page 67 
the adversarial testing process work in the particular case. At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."
Strickland, 466 U.S. at 690, 104 S.Ct. at 2066.
The second prong of the Strickland analysis requires a showing that counsel's deficiencies resulted in prejudice to the defense. The court explained that the burden is to show actual prejudice and not merely that particular errors or omissions were unreasonable.
 "Accordingly, the appropriate test for prejudice finds its roots in the test for materiality of exculpatory information not disclosed to the defense by the prosecution, United States v. Agurs, 427 U.S., at 104, 112-113 [96 S.Ct. at 2397, 2401-2402], and in the test for materiality of testimony made unavailable to the defense by Government deportation of a witness, United States v. Valenzuela-Bernal, [458 U.S. 858] at 872-74 [102 S.Ct. 3440, 3449-50, 73 L.Ed.2d 1193] (1982)."
Strickland, 466 U.S. at 694, 104 S.Ct. at 2068. The question is whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."Id. Such a consideration necessarily assumes that the decisionmaker is reasonable and impartial and conscientiously applies the proper standard, the Court noted.
 V.
We now turn to the allegations of ineffective assistance in the present case. The first allegation involves Bell's taking the stand in Womack's case. In an attempt to show that Womack was beaten to coerce a statement from him, Bell took the stand during the guilt phase of the trial and testified as follows:
 "My name is Maurice S. Bell, and I'm an attorney in Montgomery, Alabama.
 "I was called to the jail by Clarence Womack's mother. . . . And I went up and talked to Clarence Womack. And Clarence Womack informed me at that time that he had been beaten. He was trying to show me some bumps on his head, and to tell you the truth, I didn't really pay attention to it or didn't see it. And he said he was bruised on his body. I wish I had had a camera, but I didn't. But I personally did not see the evidence of bruises with Clarence Womack." (Emphasis added.)
Bell then went on to testify that Charles Johnson, who was arrested as Womack's accomplice, had bruises on his face. This led him to believe that Johnson had been beaten. The trial judge held that the evidence in regard to Johnson was inadmissible as hearsay, and at that point Bell abandoned his effort to testify.
Keeping in mind the admonitions of the Supreme Court inStrickland, that scrutiny of counsel's performance must be highly deferential, that every effort to eliminate the effect of hindsight must be made, and that it is the defendant who must overcome the presumption that this may be construed as "a sound trial strategy," we will evaluate Bell's performance. The issue, in regard to the first Strickland prong, is whether Bell's taking the stand was such a serious error that he was not functioning as the "counsel" guaranteed by the Sixth Amendment. Strickland, 466 U.S. at 687, 104 S.Ct. at 2064. After reviewing the record, we conclude that it was not within the realm of professional competent assistance for Bell to testify against his client.
Throughout the trial Bell's only strategy, according to his coram nobis testimony, was to prove that the confession was involuntary because it had been beaten out of Womack. His stated purpose for taking the stand was to impeach the testimony of the doctor who treated the prisoners, Dr. Sanders, in regard to whether certain prisoners had sought medical attention as a result of having been beaten. There are several flaws that make pursuit of such an *Page 68 
objective fall outside the range of reasonable professional conduct. The most obvious reason is that Dr. Sanders had not yet been called to the stand, so Bell could not possibly have hoped to impeach his testimony. Second, Dr. Sanders never saw Womack, so Bell could not have impeached his testimony in regard to anything material to his case. In any event, the jury was never aware that Bell's purpose was to refute Sanders's testimony, because Bell never mentioned it. Later, in questioning the prison nurse, Bell did develop testimony that Womack did not seek medical attention at all, which further tended to disprove his purported defense. Even without considering his motive for taking the stand, we find that Bell's performance on the stand denied Womack "effective assistance," because he clearly and unequivocally discredited his client's testimony and in effect destroyed the entire basis of his case. This damage to Womack's defense was aggravated by the fact that Bell did not explain to the jury that he did not visit Womack in jail until a week after the arrest and the alleged beating.
The jury was left with the erroneous conclusion that Bell visited Womack immediately after the alleged beatings occurred and that Bell did not see any evidence of injury at that time. Attorney Troy Massey, who visited Womack the day after the police took his confession, submitted an affidavit in the coram nobis proceeding stating that Womack indicated to him that he had been beaten with his tennis shoe and a telephone receiver. Massey, who also testified at the coram nobis hearing, swore that he felt approximately a half dozen knots on Womack's head and that it was his opinion that Womack had been beaten.
Disciplinary Rule 5-102, Code of Professional Responsibility of the Alabama State Bar, suggests that Bell should have withdrawn under the circumstances. DR 5-102 provides:
 "(A) If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm ought to be called as a witness on behalf of his client, he shall withdraw from the conduct of the trial and his firm, if any, shall not continue representation in the trial. . . .
 "(B) If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm may be called as a witness other than on behalf of his client, he may continue the representation until it is apparent that his testimony is or may be prejudicial to his client."
Because Bell took the stand and testified contrary to his principal line of defense, we find that he did not provide the effective assistance of counsel guaranteed by the Sixth Amendment.
The other inquiry under Strickland is whether this error prejudiced Womack's defense to the extent that he was deprived of a fair trial. In view of all of the evidence presented at the coram nobis hearing and at trial, we conclude that there is a reasonable probability that, but for Bell's testimony on the stand, the outcome of the trial would have been different.
Because evidence that Womack had been beaten was crucial to a finding that the confession was coerced, under the theory Bell presented to the jury, his testimony that Womack showed no sign of injury was a devastating blow to the defense. It permeated the entire evidentiary picture presented to the jury and created a insurmountable presumption that Womack's claim was untrue. Bell forced the jurors to an early election: either they disbelieve his client's testimony or they disbelieve Bell's testimony and the State's evidence as well. Such conduct by defense counsel certainly brings into question the fundamental fairness of the trial and shows a collapse of the adversarial process. The Sixth Amendment right to effective assistance of counsel, as explained by the Supreme Court inStrickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052,80 L.Ed.2d 674 (1984), requires that Womack's conviction be reversed on this basis.
The second allegation of ineffective assistance of counsel is that Bell failed to call as witnesses several persons *Page 69 
whose testimony Bell knew would be favorable to Womack's case. The most serious contention in this regard is that Bell failed to call James Russell Williams to the stand. Bell talked to Williams in August 1981, during a taped interview in the presence of attorney Robert Beno. Williams recalled that Martin and Jones came to his house around noon on February 2, the day of the Bullock murder. Martin told Williams that he really needed to borrow his car. Then Jones said, "I believe we done wasted somebody . . . we need to borrow your car bad," according to Williams. Williams told Bell that both men were armed and appeared very nervous. Williams's girlfriend, Mary Vinson, was also present during the conversation at Williams's house on the day of the murder.
Bell testified at the coram nobis hearing not only that he was aware that Williams would testify in substance as related above, but also that he subpoenaed him to trial. He also had a transcript of the meeting where Williams related the incident above and was aware that Mary Vinson could corroborate the story. It was his opinion that Williams was believable and that his testimony would have placed suspicion for the crime on Martin and Jones. When asked why he did not call Williams to testify, Bell responded, "I really don't know. . . . I should have called him, regardless. . . . I should have called James Williams, I went out there to the prison to talk to him. I got his statement. And I turned it over to Jimmy Evans and asked him to investigate it; he didn't investigate it. Why I didn't call him, I don't know."
Petitioner also alleges that Bell had a host of alibi witnesses who could account for Womack's whereabouts on the morning of the crime but whom he did not call to the stand. Bell had statements from Fannie Hawkins, John Perryman, Larry Womack, Annie Womack, and Richard Hawkins regarding the defendant's whereabouts on the morning of the crime, in addition to police statements from these same witnesses. According to Bell's coram nobis testimony, the witnesses' testimony would have established that Womack was at Fannie Hawkins's house during the early morning of February 2 and that he went to his mother's house later that morning. Instead of calling all of these witnesses, Bell called Charles Cole to the stand to explain Womack's whereabouts at 9:00 a.m., and Annie Womack to testify about his whereabouts at 1:00 p.m. Bell was of the opinion at the coram nobis hearing that the other witnesses were credible and that it was a mistake not to call all of them. He admitted at the coram nobis hearing that calling alibi witnesses for 9:00 a.m. and 1:00 p.m. left the jury with the erroneous impression that Womack's whereabouts during the time that the murder was committed could not be established.
The question to be addressed is the gravity of the failure to call the alibi witnesses and impeachment witnesses. Although it is undisputed that trial counsel was inept, our inquiry, under the Sixth Amendment, is not to assure the quality of legal representation. However important that goal is, our purpose is to assure that Womack received a fair trial. This Court cannot indulge in an intensive scrutiny of the motives for calling or failing to call certain witnesses. Such an inquiry would only discourage zealous advocacy and impair the independence of defense counsel. See Strickland, 466 U.S. at 690,104 S.Ct. at 2066. Our inquiry, then, is not whether the acts or omissions of counsel were prudent, but whether they were reasonable.
Although Bell had several alibi witnesses available to testify at trial, he elected to call only two. All of the alibi witnesses would have placed Womack with his alleged co-conspirator on the morning of the crime. Bell also admitted at the coram nobis hearing that there were gaps during the morning of February 2 in which Womack's whereabouts could not be accounted for. Although it might have been better not to call any alibi witnesses at all rather than to establish a partial alibi and allow the jury to speculate regarding Womack's whereabouts at the time of the murder, it is not our duty to second guess the strategy of trial counsel. It is arguable that Bell decided it was better to attack the testimony of Jones and Martin by establishing *Page 70 
Womack's whereabouts at 1:00 p.m., rather than putting him with his co-defendant at the time of the robbery. It is possible that some of the alibi witnesses were not believable to Bell at the time of trial.
Whatever the reason Bell decided not to call all of the alibi witnesses, this Court is unprepared to state, as a matter of law, that such an omission is outside the range of professionally competent assistance. As the Court said inStrickland, 466 U.S. at 689, 104 S.Ct. at 2065, "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at thetime." (Emphasis added.) Viewing things in the light of Bell's circumstances at the time of trial, one could easily envision a host of reasons for deciding not to call the alibi witnesses. This Court cannot conclude that Bell's actions in this regard fell below the minimum standard for reasonable professional assistance, as a matter of law.
Bell's failure to call James Williams presents a different question, however. After reviewing the testimony from the coram nobis hearing, and considering it in conjunction with the entire record at the time of trial, we conclude that Bell's performance in this regard was so deficient that it fell below minimal standards of "effective assistance of counsel" guaranteed by the Sixth Amendment. Even though Bell took the stand against his client and refuted his main defense, he still could have relied on the testimony of Williams to effectively impeach the evidence presented by Jones and Martin. His performance in this regard is below that required by the Sixth Amendment. He had a statement from a witness that could impeach the two key witnesses against Womack and at the same time create a doubt about their motive for testifying against him. Bell not only admitted at the coram nobis hearing that he thought the witness was believable and material to the defense, but that he had a transcribed copy of Williams's statement at the trial and knew the story could be corroborated by Williams's girlfriend, Mary Vinson. He offered no reason or justifiable "strategy" for failing to call Williams, but did say that he explained the situation to the district attorney and asked him to investigate it. Such actions would not be considered, under any circumstances, as "sound trial strategy" as explained in Strickland, 466 U.S. 668, 104 S.Ct. at 2052, and Michel, 350 U.S. at 101, 76 S.Ct. at 164. To the contrary, they indicate that counsel lacked professional judgment, was completely unaware of his duty to his client, and did not recognize his role in the adversary process.
The other inquiry under Strickland is whether this error is so serious that it deprived Womack of a fair trial, that is, a trial whose result is reliable. As stated earlier, the inquiry in this regard is whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694,104 S.Ct. at 2068. There can be no doubt that Bell's failure to call Williams as a witness for the defense was a serious error. The question to be answered is, "Did this error so prejudice the defense that the defendant was deprived of a fair trial?" This Court concludes that it did.
In making the determination that the failure to call Williams constituted sufficient prejudice to Womack's defense to amount to denial of "counsel" under the Sixth Amendment, we are mindful that the record must be viewed in its entirety. Had the proffered testimony by Williams not been so clear and strong, or had the State not relied on the testimony of Jones and Martin to tie Womack to the crime, the prejudice to the defense might not have been so great. Because the State's case depended heavily on the testimony of Jones and Martin for a conviction, and because Bell had no effective defense, other than that Womack had been coerced into a confession — a defense Bell had already destroyed — the prejudice to Womack's defense caused by the failure to call Williams *Page 71 
was devastating. There can be no confidence in the outcome of a trial where counsel for the defense has, but does not use, corroborated evidence from a disinterested witness that will not only impeach the testimony of the State's key witnesses but also implicate those witnesses in the very crime that they claim to have been witnesses to.
We note, at this juncture, how the Brady violations, explained above, strengthen the ineffective-assistance-of-counsel claim here. The State withheld evidence regarding inconsistencies between Jones's and Martin's earlier statements and several exculpatory police reports. Had the State produced such information, the relevance of Williams's testimony might have been more apparent to Bell. Had Bell been given the opportunity to impeach Martin and Jones with their prior inconsistent statements, his failure to call Williams would have, more arguably, looked like a reasonable trial tactic. Under the present circumstances, Bell's failure to call Williams resulted in material prejudice to Womack's defense and necessitates reversal under the Sixth Amendment standard enunciated in Strickland.
The third allegation of ineffective assistance regards Bell's allegedly inadequate pretrial investigation of the case. Specifically, petitioner claims that Bell was ineffective, in the constitutional sense, because he did not discover that Troy Massey had visited Womack and could verify the existence of his injuries, and because he did not investigate when Robert Beno told him that he had evidence which proved Womack's innocence but which was protected by the attorney-client privilege. Although Bell may not have conducted an exhaustive pretrial investigation, this does not necessarily lead to the conclusion that his actions cannot pass constitutional muster.
This Court is ever mindful of what the Supreme Court said inCuyler v. Sullivan, 446 U.S. 335, 344, 100 S.Ct. 1708, 1716,64 L.Ed.2d 333 (1980): "The right to counsel prevents the States from conducting trials at which persons who face incarceration must defend themselves without adequate legal assistance." Adequate legal assistance, according to the Supreme Court inStrickland, is that which assures the proper functioning of our adversarial system of justice. The fact that Bell did not discover that his client had been visited by another attorney does not rise to the level of a constitutional consideration. Although the Sixth Amendment does impose on counsel an affirmative duty to investigate, this Court is hesitant to announce any mechanical rule that makes that duty absolute. Counsel's obligation is to conduct a "substantial investigation into each of the plausible lines of defense." Strickland,466 U.S. at 681, 104 S.Ct. at 2061.
A substantial investigation is just what the term implies; it does not demand that counsel discover every shred of evidence but that a reasonable inquiry into all plausible defenses be made in the present case Bell hired a detective agency to investigate his leads, took statements from his witnesses, and pursued several avenues in attempting to prove that Womack had been beaten and that the purported confession was involuntary. The mere fact that Bell did not discover until after trial that Massey would have testified that Womack appeared to have been beaten, does not establish, as a matter of law, that counsel was ineffective. So long as the error does not impinge upon the "proper functioning of the adversarial process," it will not pose a constitutional question under the Sixth Amendment.Strickland, 466 U.S. at 686, 104 S.Ct. at 2063.
Bell's failure to investigate Beno's statement that he had exculpatory evidence that was protected by the attorney-client privilege presents a different question, however. As stated earlier, Beno had a letter from Martin in which he admitted the crime and a copy of the transcript of the meeting with the district attorney and Martin wherein Martin recanted his grand jury testimony.
After reviewing the record at the coram nobis hearing and considering the situation from Bell's perspective at the time of trial, this Court is persuaded that Bell was not acting as a reasonably competent attorney when he ignored Beno's evidence. Although *Page 72 
strategic choices made after a thorough investigation of the facts are virtually above reproach, the failure to investigate in the present case does not come within the purview of "strategy." Bell indicated at the coram nobis hearing that he never went to the Alabama Bar Association to pursue inquiry into the contents of that testimony and did not seek the assistance of the circuit judge in this regard. Such a deficient performance is a serious breach of the duty of loyalty to the client and the duty to investigate.
The guarantee of "counsel" under the Sixth Amendment envisions a reasonably competent attorney who will fulfill his role of advocate in the judicial process. Although this Court must indulge in a strong presumption that counsel's conduct falls within the range of reasonable professional assistance, under the Strickland analysis we must conclude that Bell's failure to inquire into Beno's evidence does not constitute a reasonable and informed decision, but, rather, falls below the minimum standard of effective assistance of counsel guaranteed by the Sixth Amendment.
The other inquiry under the Strickland test is whether this error was so serious that it deprived Womack of a fair trial. As the Supreme Court explained in Strickland, 466 U.S. at 694,104 S.Ct. at 2068, "[T]he appropriate test for prejudice finds its roots in the test for materiality of exculpatory information not disclosed to the defense by the prosecution,United States v. Agurs, 427 U.S. at 104, 112-113
[96 S.Ct. at 2397, 2401-2402]. . . ." The transcript of the meeting between Beno, Martin, and the district attorney is "material exculpatory evidence" under the Agurs standard, as discussed in Section III, infra. Because that evidence was material to the defense, this Court concludes that there is a reasonable probability that but for Bell's failure to investigate the outcome of the trial could have been different. The same conclusion must be drawn in regard to the letter that Martin sent to Beno. At the time of trial it represented a valuable opportunity to impeach a key witness. But for Bell's unreasonable inattention to this evidence there is a reasonable probability that the outcome of the trial would have been different. Having concluded that both requirements under theStrickland test have been met, Womack's conviction is due to be reversed for counsel's failure to investigate the exculpatory evidence offered by Beno.
The fourth claim of ineffective assistance of counsel involves the fact that Bell called witnesses to the stand when he knew or he should have known that they would give testimony favorable to the State. Petitioner claims that it was error to call officer J.B. Andrews; officer D.H. Carmichael; Shirley Ardnt, a nurse for the county jail; Harry Parks, Rex Jones's employer; and Thelma Stafford, Jones's mother.
Although all of these witnesses ultimately gave testimony that was favorable to the State, and it is arguable that Bell knew the substance of the testimony each witness would give prior to calling the witness to the stand, such errors are not so serious that Bell was not performing as "counsel" under the Sixth Amendment guarantee. Even though Bell's strategy in calling the witnesses above may have been questionable in that he elicited damaging testimony from each of them, this Court cannot say as a matter of law that it fell outside the wide range of "reasonable professional assistance" as guaranteed by the Sixth Amendment. Strickland, 466 U.S. 668, 104 S.Ct. 2052. In inquiring into counsel's performance under the Sixth Amendment, this Court must not only indulge in a strong presumption that counsel's actions were professionally reasonable but we must also recognize that the standard encompasses a wide latitude of actions in any given situation. It is conceivable that any one of these witnesses could have given testimony favorable to the defense. This being the case, we are unwilling to hold that Bell was not acting as "counsel" in the Sixth Amendment sense when he called witnesses who ultimately gave testimony that proved favorable to the State's case and detrimental to the defense.
In the opinion below, the Court of Criminal Appeals concluded that the petitioner *Page 73 
did not meet his burden of proof in showing that there was a violation of his right to due process under the Fifth Amendment or in showing materiality under United States v. Bagley,473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Inasmuch as the majority opinion in Bagley did not state any standard of materiality other than the Agurs standard, which we applied here, we will recapitulate our holding here. The Supreme Court in United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392,49 L.Ed.2d 342 (1976), concluded that the due process guarantee of the Fifth Amendment compels disclosure of exculpatory evidence in three situations.
First, due process precludes the use of perjured testimony by the prosecution in acquiring a conviction. We have concluded, in this regard, that the State's misrepresentation that it had no plea bargain or other arrangement with Jones and Martin at the time of trial was a denial of the constitutional rights of the accused. Similarly, "constitutional error" occurred when the prosecutor knowingly suppressed evidence that Martin was guilty of the crime and solicited reiteration at trial of Martin's dubious grand jury testimony. Second, due process requires the production of exculpatory evidence that is the subject of a specific pretrial request. We have concluded, therefore, that it was reversible error for the trial court to reject Womack's constitutional argument with regard to the State's suppression of police reports that showed inconsistencies with Jones's and Martin's later statements before the grand jury and the trial court. The same standard of materiality applies to favorable evidence, whether it is exculpatory evidence or impeachment evidence. Third, due process requires the disclosure of exculpatory matter, even in the absence of a request, if it creates a reasonable doubt about the defendant's innocence that did not otherwise exist. We have concluded that it was reversible error for the trial court to reject Womack's due process argument with regard to the prosecutor's suppression of evidence of Martin's attempt to recant his grand jury testimony. Similarly, it was "constitutional error" for the State to suppress the Robert Glenn memorandum, which also indicated that Jones and Martin had committed the crime.
We also hold that the Sixth Amendment right to effective assistance of counsel requires reversal on several grounds.Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052,80 L.Ed.2d 674 (1984). First, it was constitutional error under the Sixth Amendment for defense counsel to voluntarily take the stand and testify against his client. Second, reversible error occurred when defense counsel failed to present the testimony by James Williams that would have impeached the testimony of Jones and Martin and implicated them in the murder. Third, it was constitutional error for defense counsel to ignore the exculpatory evidence that Robert Beno possessed but which was protected by the attorney-client privilege.
In reaching this decision, this Court has not created any new strictures to apply in criminal trials. Rather, we have applied those protections that the United States Supreme Court proclaims must be provided under the Constitution. The Fourteenth Amendment right to due process and the Sixth Amendment right to effective assistance of counsel are fundamentals in our judicial system that should not be circumvented for the convenience of the prosecutor or expediency of the court. These constitutional guarantees, which are necessary to assure order and justice in our legal system, must not be infringed upon or fettered by the State or the judiciary.
For the foregoing reasons, the judgment below is reversed and the cause is remanded with instructions for the Court of Criminal Appeals to order a new trial.
REVERSED AND REMANDED.
All of the Justices concur. *Page 74